Argued and submitted January 7, 2008, decision of Court of Appeals reversed; judgment of the circuit court reversed, and case remanded to circuit court for further proceedings April 30, 2009

STATE OF OREGON,
*Respondent on Review,*

*v.*

ARTISSA DEHONDA GAINES,
*Petitioner on Review.*

(CC 040343619; CA A124872; SC S055031)

206 P3d 1042

Harry R. Carson, Metropolitan Public Defender, Portland, argued the cause and filed the briefs for petitioner on review.

Anna M. Joyce, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

LINDER, J.

**LINDER, J.**

Defendant was convicted of obstructing governmental or judicial administration based on her oral refusal to cooperate in being photographed after she was arrested and lodged in a county jail. Under ORS 162.235(1), a person commits the offense of obstructing governmental or judicial administration if he or she "intentionally obstructs, impairs or hinders the administration of law or other governmental or judicial function by means of intimidation, force, physical or economic interference or obstacle." The issue that this case presents is whether defendant's refusal to cooperate was a "means of * * * physical * * * interference or obstacle" within the meaning of the statute. The Court of Appeals concluded that it was and affirmed defendant's conviction. *State v. Gaines*, 211 Or App 356, 361, 155 P3d 61, *modified and adh'd to as modified on recons*, 213 Or App 211, 159 P3d 1291 (2007). As we will explain, we hold that a person's mere failure to act in compliance with a lawful directive, without more, does not violate the statute. We therefore reverse the decision of the Court of Appeals and the judgment of conviction.

Because this issue arises on defendant's motion for judgment of acquittal, we state the facts in the light most favorable to the state. *State v. Wolleat*, 338 Or 469, 471, 111 P3d 1131 (2005). In January 2004, defendant was arrested and lodged in a county jail on an unrelated charge. Defendant remained incarcerated at that facility when, on March 7, 2004, Corrections Sergeant Jacobs reviewed prisoner booking photographs and discovered that defendant's file contained only a profile photograph and not also a frontal photograph of her. Jacobs informed defendant, who was in her cell, that she needed to proceed to the booking area (which was in the basement) to take that photograph. Defendant orally refused and became teary-eyed and uncooperative. Jacobs decided not to force the issue at that time. Instead, he told defendant that he would speak with her about it the next time that he visited her housing unit in the jail.

One week later, Jacobs again approached defendant and told her that she needed to go to the basement to have the photograph taken. Defendant again orally refused and, in

addition, asked to speak to her attorney. To avoid using physical force, Jacobs again did not press the issue. Jacobs instead told defendant that she could first speak to her attorney and that they would resolve the issue the next time that he was in her housing unit.

On March 20, 2004, Jacobs approached defendant a third time. Defendant told Jacobs that her attorney had advised her that Jacobs could not lawfully take her photograph unless he produced the relevant law in writing. Jacobs informed defendant that he was not obligated to produce policies or laws. He then gave defendant a direct order to proceed to the basement to have her photograph taken. For a third time, defendant voiced her unwillingness to comply. In response, Jacobs informed defendant that he was placing her on disciplinary status until she complied with his order. He then sent defendant to her cell.

After defendant's third refusal, Jacobs checked the computer reports and discovered that defendant also had refused to cooperate during the initial booking process. According to those reports, defendant had turned her head to the side each time that the officers had attempted to take a frontal photograph of her. The reports also indicated that the officers had been required to resort to physical force to fingerprint defendant and dress her in jail garments. Due to defendant's resistance, the booking process took 17 hours to complete, instead of the normal three hours or so.

Given defendant's conduct during the initial booking process, Jacobs concluded that defendant likely would respond with physical resistance if Jacobs tried to force her to have her photograph taken. Rather than prompt a physical confrontation with defendant, Jacobs charged defendant by information with obstructing governmental or judicial administration, in violation of ORS 162.235(1). The information alleged that defendant, "on or about March 21, 2004," did "unlawfully and intentionally obstruct, impair and hinder the administration of law by means of physical interference and obstacle."[1]

[1] The state relied on only defendant's third refusal (which occurred on March 20, 2004) as the basis for the charge. The state introduced the earlier refusals into evidence only for their bearing on defendant's intent at the time of her third refusal.

Defendant was tried in a bench trial. Jacobs's testimony for the state established that defendant orally had refused to go to the booking area to be photographed and took no action to cooperate. Beyond that oral refusal and her physical inaction, the state produced no evidence of any physical resistance on defendant's part. At the close of the state's evidence, defendant moved for a judgment of acquittal, arguing that her oral refusal to go to the booking area in the basement to have her picture taken did not constitute a means of "physical * * * interference or obstacle" within the meaning of ORS 162.235. The trial court denied the motion. At the conclusion of the trial, the court found defendant guilty of the charge.

On appeal, defendant challenged that ruling, and the Court of Appeals affirmed. The Court of Appeals reasoned that "defendant's failure to move when ordered to do so obstructed Jacobs's efforts to take her photograph 'by means of * * * physical [* * *] interference [ ] or obstacle.' " *Gaines*, 211 Or App at 361. We allowed defendant's petition for review.

The question presented—*i.e.*, whether defendant's conduct, as described, constituted a "means of * * * physical * * * interference or obstacle" within the meaning of ORS 162.235(1)—poses an issue of statutory interpretation. The methodology that Oregon courts follow in interpreting statutes is a distillation of settled interpretative principles, some of which have been codified in Oregon statutes since early statehood and others of which have been articulated in this court's case law for many years. *Mastriano v. Board of Parole*, 342 Or 684, 691, 159 P3d 1151 (2007). The methodology, as outlined in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), entails three sequential levels of analysis to determine the legislature's intent. First, the court examines the text and context of the statute. *Id.* at 610-11. If the legislature's intent is obvious from that first level of analysis, "further inquiry is unnecessary." *Id.* at 611. "If, but only if," the legislature's intent is not obvious from the text and context inquiry, "the court will then move to the second level, which is to consider legislative history[.]" *Id.* at 611.[2] If the legislature's intent remains unclear after

---

[2] As we discuss below, this court has not always applied the sequential *PGE* test strictly.

examining legislative history, "the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id.* at 612.

As a preliminary matter, defendant argues that this court's so-called *"PGE* methodology" for interpreting statutes has been legislatively changed. Specifically, relying on amendments to ORS 174.020, defendant asserts that the court now must consider legislative history at the outset of the analysis and must give that history the same weight as the court gives to text and context. In other words, according to defendant, the court is statutorily bound to consider a statute's legislative history on equal footing with its text and context, whether or not the statute is ambiguous. We begin with that issue.

ORS 174.020 codifies—as it has for many years—the "cardinal rule" of statutory construction that a court "shall pursue the intention of the legislature if possible." *See Holman Trf. Co. et al v. Portland et al*, 196 Or 551, 564, 249 P2d 175 (1952) (so characterizing the rule when it was codified at OCLA § 2-217). In 2001, the legislature added provisions directed specifically to the court's consideration of legislative history. As amended (and with the 2001 additions italicized), the statute provides:

"(1)(a) In the construction of a statute, a court shall pursue the intention of the legislature if possible.

"(b) *To assist a court in its construction of a statute, a party may offer the legislative history of the statute.*

"(2) When a general and particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a general intent that is inconsistent with the particular intent.

"(3) *A court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers to be appropriate.*"

(Emphasis added.)

A threshold question for our resolution, then, is: What did the legislature intend with the addition of those provisions? That question, paradoxically, requires us to

interpret the 2001 amendments, which we ordinarily would do using the *PGE* methodology that defendant asserts the amendments have changed. We thus are faced with a conundrum—if we follow the settled *PGE* methodology to determine whether the 2001 amendments changed that methodology, and if the text and context are sufficiently plain to preclude consideration of legislative history, we run afoul of what ORS 174.020 requires, if defendant's argument is correct. For the limited purpose of resolving the meaning of the amendments to the statute, therefore, we begin with text and context, as we ordinarily would do. We then also consider, regardless of any lack of ambiguity in that text, the legislative history pertaining to what the legislature intended with the 2001 amendments to the statute.

■■ Textually, paragraph (1)(b) of ORS 174.020 provides that a party "may" offer legislative history to the court to assist in the construction of a statute. Subsection (3) complements that provision. It states that the court "may" limit its consideration of legislative history to what the parties have offered and declares that the court "shall" give the legislative history the weight that the court "considers to be appropriate." Those 2001 amendments to the statute are reasonably straightforward and provide, in effect, for three things. First, a party is statutorily entitled, but not obligated, to offer the court legislative history. Second, the court permissibly may limit its consideration to that history; the court is not obligated to independently research legislative history. Third, the court may give whatever weight it deems appropriate to the legislative history that a party offers.

In those respects, the 2001 amendments would seem to work little change to preexisting practices. No procedural rule or practice in the past has limited a party's ability to present legislative history to a court, ambiguity or no ambiguity. Nothing has ever compelled the court—other than its own resolve to correctly discern legislative intent—to go beyond the legislative history proffered by the parties. And, the use that the courts have made of legislative history traditionally has been for the courts to decide.

Relying on legislative history, however, defendant argues that the 2001 amendments require a court to consult

legislative history at the first level—that is, along with text and context, and to give that legislative history "weight equal to the weight given to text and context." For the reasons that we have already identified, we have reviewed that legislative history in this case.[3] The legislative history provides three insights that are consistent with the statute's plain text.

First, the legislature intended that, if a party proffered legislative history, a reviewing court not only would be free to consult that history together with text and context, but that the court in fact would do so. In that regard, a key sponsor of the bill, Representative Max Williams, testified that the 2001 amendments were intended to overcome the "harsh and limiting construct" of the *PGE* methodology of interpretation, which that legislator (and perhaps others) viewed as precluding the court's consideration of legislative history unless and until the court identified an ambiguity in a statute's text. Tape Recording, Senate Committee on Judiciary, HB 3677, May 15, 2001, Tape 139, Side A (statement of Rep Max Williams). Williams specifically stated that the amendments were intended to "rais[e] the court's ability to consider legislative history to the same level, not above, but to the same level as text and context." *Id.*; *see also* Tape Recording, House Committee on Judiciary, HB 3677, Apr 18, 2001, Tape 77, Side A (statement of Rep Max Williams) (similarly explaining that the bill would require a court to consider legislative history "at the same level as text and context"). In that respect, the amendments were intended to "effectuate some minor change to *PGE*[.]" Tape Recording, House Committee on Judiciary, Apr 18, 2001, Tape 77, Side A (statement of Rep Max Williams).[4]

---

[3] The original bill that would have amended ORS 174.020 was House Bill (HB) 3677. That original bill met with significant opposition and was substantially amended in its second hearing in the House Committee on Judiciary on April 18, 2001. Tape Recording, House Committee on Judiciary, HB 3677, Apr 18, 2001, Tape 77, Side A. The bill that emerged from that hearing, HB 3677-A Engrossed, passed both the House and the Senate and was the source of what became the 2001 amendments to ORS 174.020. In reviewing the pertinent legislative history, we have reviewed the legislative history proffered by defendant, which includes the minutes of the pertinent hearings and a transcript of one of those hearings. We also have reviewed the bill file and the audio recordings of all committee hearings on the bill.

[4] In its original form, HB 3677 expressly declared that the court must consider "all relevant information about a statute, without regard to whether the statute is

Second, and equally important, the legislative history confirms that the legislature intended the courts to retain full discretion to determine what weight—if any—to give to proffered legislative history in analyzing a statute's meaning. Instead, "the weight to be given to the legislative history will be what the court considers to be appropriate." Tape Recording, House Committee on Judiciary, HB 3677, Apr 18, 2001, Tape 77, Side A (statement of Rep Max Williams); *see also* Tape Recording, Senate Committee on Judiciary, May 15, 2001, Tape 139, Side A (statement of Rep Max Williams). "To mandate more," Williams cautioned, "would be both problematic and imprudent. We want judges to judge." *Id.* The legislative history thus makes it clear that the legislature specifically intended *not* to mandate or intrude on that traditional province of the judicial branch. The history therefore refutes, rather than supports, defendant's position that the 2001 amendments were intended to mandate that equal weight be given to text, context, and legislative history.

Finally, the legislative history demonstrates the complementary aspects of the legislature's dual objectives of raising consideration of legislative history to the first level of *PGE*, but not intruding on the court's role in evaluating the worth of that legislative history. The 2001 amendments, in their final form, were viewed as striking a delicate balance between the legislature's role in ensuring that its enactments are interpreted in the way that the legislature intended and the court's independent role in performing that interpretative exercise. To that end, the legislature intended, on the one

---

ambiguous, including but not limited to" records of the legislative proceedings, and also such things as "[p]ublic statements about the purpose or meaning of the statute that were made before enactment of the statute[.]" Opposition to that bill led to the formation of an informal and small workgroup, which included Williams and Justice W. Michael Gillette (in his personal capacity and not as a representative of the Oregon Supreme Court). That informal workgroup drafted the alternative form of the bill (HB 3677-A Engrossed), that passed both the House and the Senate. Justice Gillette, during the April 18, 2001, hearing, describing the amendments as

"far more narrowly tailored to the concern [that prompted the original bill], which was simply to ensure that legislative history would be consulted by a reviewing court at the first level of review, along with the wording of the statute, the context in which the statute appears, the history of the statute, former versions of the statute, and case law."

Testimony, House Committee on Judiciary, HB 3677, Apr 18, 2001, Tape 77, Side A (statement of Justice W. Michael Gillette).

hand, to ensure that the court would not turn a blind eye to pertinent legislative history if a party proffered it. On the other hand, the legislature in no way intended to dictate *what* consideration or weight would attach to that history.[5]

The legislative history supporting the 2001 amendments to ORS 174.020 does not alter our understanding of the statute's meaning, as informed by the text itself. The legislative history does, however, illuminate the problem that the legislature intended the amendments to ORS 174.020 to solve—*i.e.*, those amendments would remove the barrier that the *PGE* methodology placed on the consideration of legislative history and instead place legislative history on a par with text and context. The legislature thus intended to ease the unyielding "if, but only if" constraint that *PGE* appeared to have placed on the court's ability to even review and consider otherwise pertinent legislative history. *See PGE*, 317 Or at 611 ("If, but only if, the intent of the legislature is not clear from the text and context inquiry, the court will then move to the second level, which is to consider legislative history[.]"); *see also Owens v. Maass*, 323 Or 430, 449, 918 P2d 808 (1996) (Unis, J., dissenting) (majority errs in finding an ambiguity in the statutory text; because there is no ambiguity, the analysis must stop at the first level of *PGE*, and legislative history should not be considered). Beyond that, the legislature left it to judicial discretion to decide what value to place on legislative history proffered by a party.

---

[5] The complementary aspect of the amendments to ORS 174.020 is exemplified in an exchange between the Chair of Senate Judiciary, Senator John Minnis, and the key sponsor of the bill, Representative Max Williams. In the Senate Judiciary Committee's final hearing on HB 3677-A Engrossed before passing it to the floor, Minnis described it as "a very delicate little bill." He asked Williams to confirm his understanding that the legislative intent behind the bill was just to say to the Oregon Supreme Court: "[G]ee whiz, honorable justices, should you have a case before you, would you please consider legislative history and please take it into consideration in your deliberations to the extent that you see fit." Tape Recording, Senate Committee on Judiciary, HB 3766, May 15, 2001, Tape 139, Side A (statement of Sen John Minnis). Williams confirmed that that was "an accurate way to describe it." He explained that he considered it important for the court to "determine the weight that it ought to give the legislative history," and he recognized that not all legislative history "is equal." The bill was intended to change only the *PGE* methodology, pursuant to which the court would "never turn" to legislative history unless the text was ambiguous. Williams emphasized: "[T]his simply says that the court shall consider [legislative history.] Doesn't tell them the weight they have to give it but they at least have to consider it. * * * So I think it strikes the very delicate balance that is necessary[.]" *Id.* (statement of Rep Max Williams).

To be sure, in practice, this court may not always have adhered strictly to the unyielding sequential methodology that *PGE* announced. At least some of this court's cases have reviewed and considered the legislative history, without identifying an ambiguity, and sometimes after concluding affirmatively that there was none.[6] Even so, *PGE* said what it said, and the methodology that it announced generally has been understood to foreclose any review and consideration of legislative history in the absence of an ambiguity in a statute's text. The legislature clearly intended that, by declaring that a party may offer the court legislative history, the 2001 amendments to ORS 174.020 would have the practical effect of eliminating that bar. Equally important, however, the legislature also intended the court to retain the authority to determine, as a discretionary matter, what weight, if any, to

---

[6] In several cases, the court has reviewed the pertinent legislative history to confirm the meaning of the terms in the statute, without determining the terms to be ambiguous, and sometimes after declaring them to be unambiguous. *See Ware v. Hall*, 342 Or 444, 452 n 6, 154 P3d 118 (2007) (to the extent that text and context left any doubt about statute's meaning, legislative history removed it); *Roberts v. SAIF*, 341 Or 48, 53, 136 P3d 1105 (2006) (after examining the text of statute, and without declaring whether its meaning was in doubt, court reviewed legislative history to confirm conclusions about the meaning of the text); *Trendwest Resorts, Inc. v. Dept. of Rev.*, 340 Or 413, 420-21 n 3, 134 P3d 932 (2006) (text of statute was sufficiently clear to preclude consideration of legislative history; nevertheless, court reviewed history submitted by taxpayer and found nothing in it to negate court's reading of statutory text); *Mabon v. Wilson*, 340 Or 385, 391, 133 P3d 899 (2006) (after declaring that the court was satisfied that the text, considered in context, was not ambiguous, the court considered legislative history to determine "whether that history undercuts in any way our preliminary assessment of the meaning of the [statute's] wording"); *Bobo v. Kulongoski*, 338 Or 111, 117-18, 107 P3d 18 (2005) (considering legislative history without concluding that statute is ambiguous); *State ex rel Huddleston v. Sawyer*, 324 Or 597, 606, 932 P2d 1145 (1997) (court reviewed legislative history and concluded that, "if" text and context left any doubt as to statute's meaning, legislative history "quiets that doubt"); *Nolan v. Mt. Bachelor, Inc.*, 317 Or 328, 335, 856 P2d 305 (1993) (where text of statute suggested a particular interpretation, court looked to legislative history for confirmation; court did not identify any competing interpretation also suggested by the statute).

The court has also consulted the legislative record, without first declaring the text to be ambiguous, to determine whether the legislature modeled the statute on another jurisdiction's legislation. *See Nakashima v. Board of Education*, 344 Or 497, 512 n 18, 185 P3d 429 (2008) (court examined legislative history to confirm that federal law was the source of distinctive terminology in statute); *O'Donnell-Lamont and Lamont*, 337 Or 86, 105, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005) (addressing legislative history of statute, without identifying a textual ambiguity, to consider amendments made by the legislature to conform to federal case law developments).

give that legislative history. A court need only consider legislative history "for what it's worth"—and what it is worth is for the court to determine.

■ This court remains responsible for fashioning rules of statutory interpretation that, in the court's judgment, best serve the paramount goal of discerning the legislature's intent. In that regard, as this court and other authorities long have observed, there is no more persuasive evidence of the intent of the legislature than " 'the words by which the legislature undertook to give expression to its wishes.' " *State ex rel Cox v. Wilson*, 277 Or 747, 750, 562 P2d 172 (1977) (quoting *U. S. v. American Trucking Ass'ns.*, 310 US 534, 542-44, 60 S Ct 1059, 84 L Ed 1345 (1940)). Only the text of a statute receives the consideration and approval of a majority of the members of the legislature, as required to have the effect of law. Or Const, Art IV, § 25. The formal requirements of law-making produce the best source from which to discern the legislature's intent, for it is not the intent of the individual legislators that governs, but the intent of the legislature as formally enacted into law:

> "[N]ot only is it essential that the will of the law-makers be expressed, but it is also essential that it be expressed in due form of law; since nothing is law simply and solely because the legislators will that it shall be, unless they have expressed their determination to that effect, in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential."

Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 130 (1868). For those reasons, text and context remain primary, and must be given primary weight in the analysis. Nothing in the 2001 amendments to ORS 174.020 purports to require the courts to retreat from that long-standing recognition.

■ ■ We therefore conclude that, in light of the 2001 amendments to ORS 174.020, the appropriate methodology for interpreting a statute is as follows. The first step remains an examination of text and context. *PGE*, 317 Or at 610-11. But, contrary to this court's pronouncement in *PGE*, we no longer will require an ambiguity in the text of a statute as a

necessary predicate to the second step—consideration of pertinent legislative history that a party may proffer. Instead, a party is free to proffer legislative history to the court, and the court will consult it after examining text and context, even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis.[7] However, the extent of the court's consideration of that history, and the evaluative weight that the court gives it, is for the court to determine. The third, and final, step of the interpretative methodology is unchanged. If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty.

With regard to this changed methodology, we clarify that a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it. Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute.[8] For those or similar purposes, whether the court will conclude that the *particular* legislative history on which a party relies is of assistance in determining legislative intent will depend on the substance and probative quality of the legislative history itself.[9] We emphasize again that ORS

---

[7] In his comments to the House Judiciary Committee, Justice Gillette described the net effect of the 2001 amendments to ORS 174.020 in these terms:

"[T]he message that is contained in [the amendments] is: to any court, to any single trial judge, the Court of Appeals, or the Supreme Court, please guys, don't just look at the words, look at what happened when the words were put together in the statute, and if those assist you in understanding what the words mean, will you please make use of it? And if they don't, don't."

Testimony, House Committee on Judiciary, HB 3677, Apr 18, 2001, Tape 77, Side A (statement of Justice W. Michael Gillette).

[8] Use of legislative history to establish an ambiguity in a statute is analogous to the principle in contract interpretation that, in deciding whether an ambiguity exists, the court is not limited to mere text and context, but may consider parol and other evidence extrinsic to the contract. *See Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994) (articulating that principle).

[9] Justice Graber, in a dissenting opinion in *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995), identified only some of the pitfalls of relying too greatly on legislative history:

174.020 obligates the court to consider proffered legislative history only for whatever it is worth—and what it is worth is for the court to decide. When the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different.[10]

With that understanding of ORS 174.020, and the role it gives—and does not give—to legislative history in the court's task of interpreting statutes, we turn to the merits of defendant's challenge to her conviction. ORS 162.235(1), which defines the offense of obstructing governmental administration, provides:

> "A person commits the crime of obstructing governmental or judicial administration if the person intentionally obstructs, impairs or hinders the administration of law or other governmental or judicial function by means of intimidation, force, physical or economic interference or obstacle."

The principal dispute between the parties is over the meaning of the terms "physical interference or obstacle."[11] On review in this court, the parties renew the arguments that they made to the Court of Appeals.[12]

---

"In general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment. By contrast, an examination of legislative history is most fraught with the potential for misconstruction, misattribution of the beliefs of a single legislator or witness to the body as a whole, or abuse in the form of 'padding the record' when the views of only a small number of persons on a narrow question can be found."

[10] The legislative history suggests that at least the key sponsor of the 2001 amendments, Representative Max Williams, expected nothing different from the courts: "We still have to mean what we say when we say it. We can't say black, and then * * * all agree that black meant white. That's not going to work." Tape Recording, Senate Committee on Judiciary, HB 3677, May 15, 2001, Tape 139, Side A (statement of Rep Max Williams).

[11] In its current form, the statute refers to "physical or economic interference or obstacle." Originally, however, the statute's reach was limited to "physical interference or obstacle"; the words "or economic" were added to the statute in 1981. Or Laws 1981, ch 902, § 1. We therefore frequently quote the key terms as they were originally enacted—that is, without "or economic" inserted in the middle of the phrase—because that is the text that best reflects the legislature's intent in the original enactment, as that intent pertains to this case.

[12] Defendant also renews her challenge to the sufficiency of the evidence to establish that she had the requisite intent to commit the crime—*i.e.*, that, in refusing to be photographed, she intended to obstruct the officer's effort to

Defendant, for her part, does not dispute that, when she refused to accompany the officer to the booking area, she obstructed, impaired, or hampered the performance of a governmental function. In defendant's view, however, she did not do so through physical means. Defendant urges that the statute requires some form of affirmative physical action by a defendant and that it is not enough that a defendant "verbally" refuses to comply with an order to take physical action.

The state counters that defendant did more in this case than merely verbally refuse to do something; she in fact did not move her body from one place to another. The state emphasizes that defendant could have said nothing or could have agreed to go to the booking area and, under the state's theory, she still would have violated the statute based on her failure to physically go to the booking area when told to do so.

The Court of Appeals agreed with the state's line of argument, reasoning that "[a] failure to move one's body can fairly be said to 'relate to the body.'" *Gaines*, 211 Or App at 360. The court explained:

"In *State v. Mattilla*, 77 Or App 219, 712 P2d 832, *rev den*, 301 Or 77 (1986), sheriff's deputies charged with evicting the defendant from the premises ordered him to remove the crutch blocking their way into the home, and defendant refused. The defendant argued that his conduct was not 'physical interference,' and we held that evidence of the defendant's refusal to remove the crutch and intent to block the deputies from entering could support a conviction under the statute. As in the present case, the defendant did not thwart the deputies' efforts by means of bodily movements. Rather, in *Mattilla*, the defendant verbally refused to use his body to move something (a crutch), thereby impeding the deputies' performances of their lawful duties. We see no meaningful distinction between the facts of *Mattila* and the facts of this case. Here, defendant verbally refused to move something (her body), thereby impeding Jacobs's performance of his lawful duties. We therefore conclude that defendant's failure to move when ordered to do so obstructed

---

photograph her. We need not reach that issue, given our ultimate conclusion that defendant's failure to accompany the officer did not amount to a "physical interference or obstacle" within the meaning of the statute.

Jacobs's efforts to take her photograph 'by means of * * * physical [* * *] interference [ ] or obstacle.' "

*Id.* at 360-61.

▮▮▮▮ We begin—as exercises in statutory interpretation always should begin—with the text of the statute. The legislature did not define any of the terms in the phrase "physical interference or obstacle." They are, however, terms of common usage. *See PGE*, 317 Or at 611 (court ordinarily presumes that legislature intended terms to have plain, natural, and ordinary meaning). "Interference" commonly means an act that meddles in or hampers an activity or process.[13] Similarly, "obstacle" commonly is something that hampers or halts action or progress by standing in the way of that action or progress.[14] Finally, "physical," as used in this context, commonly means something material, including things of or related to the body.[15]

▮▮▮▮ The Court of Appeals concluded that defendant's failure to move was "of the body"—in other words, defendant's inaction was physical in nature. That reasoning, however, emphasized the term "physical" in isolation, rather

---

[13] The dictionary defines "interference" as "the act of meddling in or hampering an activity or process * * * : OBSTRUCTION, INHIBITION." *Webster's Third New Int'l Dictionary* 1178 (unabridged ed 2002).

[14] *Webster's* defines obstacle as "something which hampers or stops action or progress. OBSTACLE applies to anything which stands in one's way or stops passage[.]" *Webster's* at 1558.

[15] *Webster's* contains two definitions that apply to the term "physical" as it is used in this context: (1) "of or relating to natural or material things as opposed to things mental, moral, spiritual or imaginary" and (2) "of or relating to the body[.]" *Webster's* at 1706. The second is a subset of the first: something of or relating to the body is also something natural or material.

The legislature frequently uses the term "bodily" when it intends to describe only acts of or relating to the body. *See, e.g.*, ORS 161.085(2) ("voluntary act" includes a "bodily movement" performed consciously); ORS 167.062(5)(a) ("Live public show" means a public show in which human beings, animals, or both "appear bodily" before spectators or customers). The context in which the term "physical" is used here—*i.e.*, obstructing governmental functions—would be an odd one for the legislature to intend to give a narrow meaning to the term "physical." That is, it would seem to all but frustrate the purpose of the statute for the legislature to prohibit acts in which a person uses his or her body to obstruct a governmental function, but not prohibit the use of a material object or other tangible means to accomplish the same end (and indeed, to accomplish it as well or possibly better). As the legislative history that we later examine confirms, the legislature intended the term "physical" to have a broad meaning in this statutory context, rather than be limited to "bodily" interferences.

than as an adjective that modifies the words interference and obstacle. What the statute requires is a physical *interference* or *obstacle*. As a phrase, "physical interference or obstacle" connotes a material or bodily act or means of standing or blocking or otherwise physically interposing someone or something in the way of an activity or process, and thereby halting or hampering that activity or process.

So understood, mere inaction, without more, would not seem to qualify. More to the point for purposes of this case, a person who takes no action to assist a governmental official by moving from point A to point B, under circumstances where that person is not physically blocking or in the way of the official, would not be a "physical interference or obstacle," as those words are ordinarily understood. It runs counter to the common and natural meaning of those words to conclude that something or someone is a "physical interference or obstacle" to a governmental function because that someone or something is not where the government needs someone or something to be, rather than because the someone or something is tangibly in the government's way.

We thus initially conclude, based on our examination of the text of ORS 162.235(1), that defendant has the better of the argument—that is, for a defendant to obstruct a governmental function by means of a "physical interference or obstacle" requires some conduct or act on a defendant's part that results in a bodily or material obstruction to a governmental activity or process. The text does not support a conclusion that mere inaction or mere lack of cooperation is within the statute's scope.

The state, however, cites two other criminal statutes that, the state argues, provides contextual support for its position. The first is ORS 162.247(1)(b), which prohibits "[i]nterfering with a peace officer" and provides, in part, "A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer * * * [r]efuses to obey a lawful order by the peace officer * * *." The other statute is ORS 162.315(1), which prohibits "[r]esisting arrest," and provides, in part, "A person commits the crime of resisting arrest if the person intentionally resists a person known by the person to

be a peace officer or parole and probation officer in making an arrest." In both statutes, the legislature expressly enacted an exception for "passive resistance" and provided that such resistance does not violate the statute. ORS 162.247(3)(b); ORS 162.315(2)(c). Relying on those express exceptions, the state urges that the legislature's failure to include a similar express exclusion in ORS 162.235 must be viewed as a purposeful omission, with the result that passive resistance falls within the conduct that the statute proscribes.

 The state's reliance on those other statutes is misplaced, however. Neither statute is limited to "physical" conduct. The offense of interfering with an officer requires only that the person refuse to obey a lawful order, not that he or she physically disobey in a physical way. Likewise, the offense of "resisting arrest" requires only that someone intentionally "resists" arrest, and "resists" is defined to include "physical force or any other means * * * includ[ing] behavior clearly intended to prevent being taken into custody * * *." ORS 162.315(2)(c). Because of their greater breadth in terms of proscribed conduct, those statutes more naturally might be understood to encompass passive or otherwise nonphysical resistance or disobedience, and an express exemption for "passive resistance" was one way for the legislature to narrow their reach. In other words, those statutes, because they do not use the "physical" qualifier that ORS 162.235 includes, are not analogues to ORS 162.235.[16]

 Consistently with ORS 174.020(1)(b), as we earlier explained, we do not end our analysis at text and context, however. We next consider the legislative history that the parties have proffered, along with any pertinent legislative

---

[16] Worth noting, as well, is that both statutory exclusions that the state relies on were enacted after ORS 162.235, which, as we later discuss, was enacted in 1971 as part of the comprehensive overhaul of Oregon's criminal code. *See* Or Laws 1989, ch 877, § 1(2) (adding exclusion for "passive resistance" to the resisting arrest statute); Or Laws 1997, ch 719, § 1(3) (enacting offense of interfering with a peace officer). Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute. *See Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997) (so observing). It may be that later enacted statutes can be of some aid in interpreting an earlier one for the limited purpose of demonstrating the legislature's adherence to certain conventions in legislative drafting or word usage. In all events, here, the statutes on which the state relies are distinguishable, because they do not include the limiting term "physical" in describing the means by which the offenses are committed.

history that we independently have examined. We again caution that, in considering legislative history, we will not lightly disregard our understanding of the statute based on the common and natural meaning of its text and context. Stated another way, highly probative and persuasive legislative history would have to inform our understanding of the meaning of the words for us to conclude that "physical interference or obstacle" includes someone's failure, without more, to cooperate by physically assisting a governmental official. In this instance, as we will explain, the legislative history neither reveals a latent ambiguity in the words nor contradicts our understanding of the import of the words themselves. To the contrary, the legislative history corroborates the meaning that the text itself conveys.

ORS 162.235 was enacted as part of the 1971 Legislative Assembly's comprehensive revision of Oregon's criminal code. That revision began with the creation, in 1967, of the Criminal Law Revision Commission. *State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980) (describing history of 1971 criminal code revision). As this court most recently has explained:

"The Commission divided responsibility for drafting the revised criminal code among three subcommittees. Those subcommittees produced drafts of the code and submitted those drafts, together with commentaries on them, to the Commission, which produced a final draft of the proposed code and presented the final draft and commentary to the legislature. This court has looked to both the commentary and the discussions that preceded the adoption of the final draft as legislative history for the resulting laws."

*State v. Lonergan*, 344 Or 15, 25 n 3, 176 P3d 374 (2008) (Kistler, J., dissenting; citation omitted); *see also State v. Woodley*, 306 Or 458, 462, 760 P2d 884 (1988) (unless a contrary indication exists, court assumes that the legislature accepted the Commission's explanations for its drafting choices); *State v. Knowles*, 289 Or 813, 822, 618 P2d 1245 (1980) (the extensive Commission minutes, including the commentaries to the preliminary drafts, are a rich source of legislative history); *Garcia*, 288 Or at 416 (same).

The commentary to the preliminary draft of what would later become ORS 162.235 explained that the statute was based on a composite of the parallel provisions of Michigan, New York, and the Model Penal Code. Criminal Law Revision Commission, Article 24, Preliminary Draft No. 1, June 1969, p 11 ("Preliminary Draft No. 1"). The statute was intended to be a "general provision directed at suppression of the unlawful obstruction of governmental functions," *id.* at 5, which would serve as a residual provision that would reach the obstruction of governmental functions not covered by more specific sections of the criminal code (*e.g.,* resisting arrest and bribery). *Id.* at 7; Model Penal Code § 242.1, comment 2 at 203 (Proposed Official Draft 1962) ("Model Penal Code"). To that end, the word "obstructs" was intended to have an expansive meaning consistently with its accepted judicial meaning—*i.e.,* " 'to impede, to interpose impediments, to the hindrance or frustration of some act or service; as to obstruct an officer in the execution of his duty.' " Preliminary Draft No. 1 at 6 (quoting *Black's Law Dictionary* 1228 (4th ed 1951)). Also, the provision does not require that the governmental function be completely frustrated or prevented. Rather, the provision is concerned equally with conduct that makes a governmental function more difficult or slow to accomplish. *Id.* at 6-7; Model Penal Code, comment 2 at 203-04.

To temper the provision's breadth, however, the drafters incorporated significant limitations as well. As the commentary to the Model Penal Code characterized it, the provision was intended to be an "amalgam of generality and constraint." Model Penal Code, comment 2 at 203. One significant constraint is that the provision requires a person to have acted intentionally and with a conscious objective to obstruct a governmental function. Also, the provision requires success—that is, a governmental function actually must be hindered or impeded to some degree. Preliminary Draft No. 1 at 11; Model Penal Code, comment 2 at 204. Finally, and most significantly for purposes of this case, the provision specifies and limits the means by which the obstruction is created. Those prohibited means include, among others, "physical interference or obstacle." The comments to the Model Penal Code explain that the point of that

wording was to ensure that the provision included more than violence and force, but was still limited to some form of physical action: "[T]he section [through the phrase 'physical interference or obstacle'] reaches any *affirmative act of physical* interference not explicitly excepted, whether or not violence is involved." Model Penal Code, comment 3 at 204.[17]

In some tension with that observation, the drafters of Oregon's provision suggested that, in the right circumstance, the necessary "physical" act might be a "passive indirect, or circuitous" one. Preliminary Draft No. 1 at 7. Specifically, the preliminary draft quoted 48 ALR 749 (1927), a legal annotation that made the following observation about the reach of statutes around the country that prohibited resisting or obstructing a police officer in the line of duty:

> "[Obstruction] includes any passive, indirect, or circuitous impediments to the service or execution of process; such as hindering or preventing an officer by not opening a door or removing an obstacle, or concealing or removing property. So that, although, to establish a case of resistance, it must appear that the party was personally present and personally resisting, liability to the charge of obstructing may be established by showing that the party has willfully caused any impediment or hindrance to be interposed, though not personally present and actively co-operating in the direct act of obstructing. It should appear, however, that such

---

[17] The Model Penal Code comments, the Commission's preliminary draft of the Oregon statute, and the commentary to the Michigan statute (which, as we later discuss, we know was reviewed by the Oregon drafters) all use the terms "interference" and "obstacle" interchangeably, with the term "physical" modifying both. The Michigan commentary contains the only explicit mention of why both terms, "interference and obstacle," were used:

> "[The Michigan obstruction statute] applies only to obstruction through the use or threat to use 'violence, force, or physical interference or obstacle.' The key here is the reference to 'physical interference.' Force and violence, of course, are only forms of physical interference; therefore, the references to these terms add nothing in and of themselves to the scope of the statute. They are included primarily as a way of emphasizing that 'interference' encompasses more than obstruction by assault. The reference to physical 'obstacle' serves a similar function. Creation of a physical obstacle would of course constitute use of physical interference, and the specific reference to obstacles is included only to re-emphasize that [the statute] goes beyond obstruction by force."

Michigan Revised Criminal Code § 4505 (1967).

party, in some manner and at some stage, aided or abetted the act of obstructing."

As that passage indicates, however, the "physical interference or obstacle" still must entail a material or tangible barrier or impediment that physically impedes a governmental function or activity. In the examples given, inaction or passive conduct potentially violates the statute not because inaction is itself a physical act, but because the inaction leaves a physical impediment in the way of a government function, under circumstances where the person bears some responsibility for having placed it in government's way. Nothing in that quoted passage suggests that a mere failure of a person to move from point A to point B, without more, would qualify as a physical interference or obstacle.

In all events, later in the preliminary draft, the drafters made clear that a mere refusal to act or to obey an order would not suffice to violate the obstruction statute. The drafters made that policy choice by following Michigan's lead in not including, contrary to the approach of the Model Penal Code and New York, an "unlawful act" as an additional means of obstructing a governmental function. The drafters explained:

"The Model Penal Code extend[s] coverage also to 'any other unlawful act.' This language was incorporated into the New York Revised Penal Code section 195.05 as 'any independently unlawful act.' The term was not included in Michigan Revised Criminal Code section 4505. The rationale for the Michigan revisor's rejection of this extension of coverage is stated in their committee commentary:

" 'This provision would, of course, bar such acts of nonphysical obstruction as the impersonation of another in taking a civil service examination on his behalf. But many such independently unlawful acts are already made illegal by special provisions dealing with the particular matter involved * * * moreover, many others are of minor significance * * * the failure to file a report required by law, for example, is an unlawful act which may obstruct government operations, but it hardly belongs on par with obstruction by physical interference. The same can be said for the failure to perform various other legal obligations, including,

perhaps, the failure to pay a parking ticket.' (See Michigan Revised Criminal Code, Committee Commentary, p 328).

"Your reporter concurs with the rationale behind the Michigan approach."

Preliminary Draft No. 1 pp 10-11 (omissions in original).

Those parts of the legislative history are, in our view, the most informative for purposes of the issue before us.[18] And, they confirm for us that the legislature intended what the words most naturally convey. To violate the statute by means of a "physical interference or obstacle," a person must engage in some act that results in a bodily or material obstruction to a governmental activity or process. The act may not always have to be an affirmative and direct one. The legislative history suggests that inaction will suffice, if the inaction results in leaving a physical object or barrier in the way of a governmental activity, under circumstances in which the person is responsible for it being there or responsible for removing it. Barricading a door in advance of the police arriving, and then refusing to remove the barricade once they are there, should suffice just as much as would barricading the door the moment that police try to enter. Likewise, hiding or securing property so that officials cannot seize it, and then refusing to lead officials to it or to otherwise release it to them, also would suffice. Those examples, however, involve more than a person's mere lack of cooperation with police in moving one's own body; rather, they involve

---

[18] The state places particular reliance on a part of the preliminary draft that summarized a law review survey of related laws from around the country. The preliminary draft set out a "topic outline" from the law review article of the fact patterns in the cases surveyed, which listed under the topic "Physical Acts" the subtopic "Refusal to follow an officer's order." Preliminary Draft No. 1 at 8 (citing "Types of Activity Encompassed by the Offense of Obstructing a Public Officer," U of Pa L Rev 108, 388-413 (1960)). The state reads that as a "list of activities [that the drafters] believed to fall within [ORS 162.235]" and evidence that the drafters "expressly intended to cover refusal to follow officer's orders" as a means of violating the statute. The topic outline was immediately followed by a representative sampling of "a number of fact situations that have been judicially construed to be either within or beyond the ambit of kindred obstruction statutes." Preliminary Draft No. 1 at 9. That list included cases holding both ways—that is, cases holding that particular statutes had been violated by a refusal to follow an officers order and cases in which courts had found no violation on such facts. *Id.* at 9-10. We view the discussion in the preliminary draft at that point to be background about the law generally, rather than a discussion that was in any way specific to the statute being proposed.

failing to take action to remove a physical barrier that the person has placed in the way of a governmental activity or function.

 We therefore hold that mere inaction, as a matter of law, does not amount to "physical interference or obstacle" within the meaning of ORS 162.235(1). The statute is not designed to compel people to cooperate with government any time that government needs them to physically move their body from one locale to another for government to most efficiently do its job.[19] That is not to conclude that individuals are free to disobey a lawful official order or other command without consequence. However, the consequences that follow for their refusal, and the circumstances in which those consequences will follow, are the subject of other statutes or administrative regulations. This statute is concerned with tangible barriers and obstacles that are placed or left in the way of a governmental activity or process.

 In this case, defendant passively refused to accompany the officer from her cell to the booking area; she did nothing more. That mere refusal was not enough to convict her of a violation of ORS 162.235(1).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[19] To be sure, the context of a jail setting, where inmate compliance with orders and directives are important to the safety of other inmates and the orderly conduct of the facility, raises particular concerns if officials have no means to enforce their directives short of physical force or confrontation. But, of course, jail and prison officials have such means in the form of their significant disciplinary authority. *See, e.g.*, ORS 169.076(12) (counties to have and provide to inmates written rules for inmate conduct and disciplinary procedures); ORS 421.105 (prison superintendents may impose "appropriate punishment" for disobedience with prison rules); ORS 421.180 (Department of Corrections to adopt disciplinary procedures for persons committed to its physical and legal custody). The state's proposed interpretation of the statute—which would criminalize a citizen's mere physical nonmovement when that nonmovement impairs government's efficiency—is particularly concerning in the context of ordinary interactions of citizens *vis-à-vis* their government, to which the offense of obstructing governmental or judicial administration broadly applies.