No. 332 April 29, 2026 1

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT PAUL KEEGAN,
*Defendant-Appellant.*

Jackson County Circuit Court
20CR64133; A181630

Timothy Barnack, Judge.

Argued and submitted June 2, 2025.

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Erica L. Herb, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

Defendant appeals his convictions for second-degree assault, ORS 163.175; manslaughter in the first degree, ORS 163.118; unlawful possession of a firearm, ORS 166.250; and recklessly endangering another person, ORS 163.195. In three assignments of error, defendant challenges the trial court's jury instruction on the "combat by agreement" limitation to self-defense under ORS 161.215(1)(c) and the prosecutor's closing argument relying on that instruction. We conclude that the evidence did not support the instruction on "combat by agreement" under ORS 161.215(1)(c), and accordingly, we reverse and remand.

## STANDARD OF REVIEW

The question of whether a trial court properly instructed the jury is a question of law. *State v. Cunningham*, 320 Or 47, 57, 880 P2d 431 (1994); *State v. Lakeside*, 277 Or 569, 561 P2d 612, *aff'd sub nom Lakeside v. Oregon*, 435 US 333, 98 S Ct 1091, 55 L Ed 2d 319 (1978). In determining whether an instruction was appropriately given, we "view the evidence in the light most favorable to the party requesting the instruction." *State v. Payne*, 366 Or 588, 607, 468 P3d 445 (2020). We reverse based on instructional error only if "the instructions [as a whole] probably created an erroneous impression of the law in the minds of the jurors that affected the outcome of the case." *State v. Tucker*, 241 Or App 457, 463, 251 P3d 224 (2011); *see also State v. Bock*, 310 Or App 329, 345, 485 P3d 931 (2021) (finding reversible error where the trial court erred by instructing the jury on self-defense from the victim's perspective without proper factual predicates present).

Once a claim of self-defense has been raised, because the state bears the burden of disproving that defense beyond a reasonable doubt, it is also the state's burden to request instructions on self-defense, including any applicable limitations. *State v. Brown*, 327 Or App 592, 597-98, 536 P3d 1069 (2023); *but see State v. Worsham*, 373 Or 739, 571 P3d 759 (2025) (holding that trial court is not required to instruct on terms of art for limitation on self-defense, absent request).

BACKGROUND

Defendant was living at a hotel on the second floor, which faced the parking lot below. AE was a 19-year-old Black man who was staying at the same hotel. At four in the morning, defendant became frustrated that AE was playing loud music in the parking lot, so defendant yelled profanities from his window and shouted to AE to turn off the music. AE shouted that defendant should "say that to [his] face." Defendant left his room carrying his gun in his coat pocket. First, defendant complained about the noise to the hotel manager. The manager talked to AE, but AE denied playing music. Next, defendant approached AE in the parking lot—carrying his gun—and the parties argued about whether AE was being loud.

AE called defendant the "N word," to which defendant said, "don't call me the N word" and said the word back to AE.[1] AE started "swinging" at defendant. The situation escalated, and they began fighting. The manager testified that the fight looked "mutual" even though AE was on the offensive side and defendant was on the defensive side. The hotel manager tried to stop the fight but was hit by one of the punches, so he decided to stay out of it. Although the manager saw both men "swinging," he was unclear if anyone made contact. The manager did not hear defendant warn AE to stop. Next, defendant pulled out his gun and shot AE. The manager called 9-1-1. AE died as a result of the gunshot wound.

At trial, the only issue in dispute was whether defendant acted in self-defense. Defendant requested a jury instruction on self-defense under ORS 161.209, and the state requested an additional instruction on the "mutual combat" limitation on self-defense in ORS 161.215(1)(c), which the state described as "combat by agreement." Defendant's attorney objected to the "combat by agreement" instruction, stating that it did not apply. The court concluded that the facts supported the instruction:

> "*There was evidence in the record that there was swinging by both parties* and that was from the—this is what I recall—from the clerk in that particular manner, that

___

[1] It was clear from the testimony that the full "N word" was used at all relevant times during the altercation.

*those facts would support in this court's opinion a mutual combat situation."*

(Emphasis added.). The trial court subsequently gave the instruction:

> "Use of physical force in defense of a person, mutual combat is no defense. A person is not justified in use of physical force on another person if the physical force involved was a product of combat by mutual agreement not specifically authorized by law."

During closing argument, the prosecutor relied on that limitation, stating:

> "So who provoked the first swing to get it started, right? What do you think is going to happen in a heated argument with a black teenager if you throw the N word back in his face? Well, he says he never even swung or put his hand up, but the eyewitness saw it. It was mutual combat. Both were going at it. Both were fighting.
>
> "It was not the one-way attack [defendant] described. It just wasn't."

(Emphases added.). The prosecutor explained that if the jury found that both defendant and AE swung at each other, it could not find self-defense.

## ANALYSIS

The question before us is whether the record contains sufficient evidence to support a determination that combat by agreement occurred. We begin with statutory construction of "combat by agreement" in ORS 161.215(1)(c), then we examine whether there is sufficient evidence to demonstrate that such an agreement occurred in this case.

ORS 161.209 defines self-defense. It provides:

> "Except as provided in ORS 161.215 and 161.219, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

A self-defense claim generally involves two issues. *State v. Stapp*, 266 Or App 625, 632, 338 P3d 772 (2014). The first issue is whether the person reasonably believed that they needed to defend themselves from the "use or imminent use of unlawful physical force" by another person. ORS 161.209. The second issue is the degree of force that the person reasonably believed "to be necessary for the purpose" of self-defense. ORS 161.209; *see State v. Charles*, 54 Or App 272, 279, 634 P2d 814 (1981), *aff'd*, 293 Or 273, 647 P2d 897 (1982) ("[A] threat of death or great bodily harm that is not imminent cannot justify use of deadly force [for self-defense], because the use of such force may be unnecessary.").

The legislature has placed limitations on the use of force in self-defense generally under ORS 161.215 and on the use of deadly force in self-defense under ORS 161.219.[2] ORS 161.215 provides, in relevant part,

"(1)   Notwithstanding ORS 161.209, a person is not justified in using physical force upon another person if:

"(a)   With intent to cause physical injury or death to another person, the person provokes the use of unlawful physical force by that person.

"(b)   The person is the initial aggressor, except that the use of physical force upon another person under such circumstances is justifiable if the person withdraws from the encounter and effectively communicates to the other person the intent to do so, but the latter nevertheless continues or threatens to continue the use of unlawful physical force.

"(c)   The physical force involved is the product of a combat by agreement not specifically authorized by law.

---

[2] ORS 161.219 provides the following limitations on the use of deadly force in self-defense:

"Notwithstanding the provisions of ORS 161.209, a person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Committing or attempting to commit a burglary in a dwelling; or

"(3) Using or about to use unlawful deadly physical force against a person."

"(d)   The person would not have used physical force but for the discovery of the other person's actual or perceived gender, gender identity, gender expression or sexual orientation."

The legislature has not defined the phrase "combat by agreement not specifically authorized by law." In construing a statute, our "paramount goal" is to discern the enacting legislature's intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). We follow a three-step methodology to discern that intent. *Id*. at 171-72.

The first step is to examine the disputed text in context. *Id*. at 171. Text and context "must be given primary weight in the analysis." *Id*. That is because "[o]nly the text of a statute receives the consideration and approval of a majority of the members of the legislature, as required to have the effect of law." *Id*. "The formal requirements of lawmaking produce the best source from which to discern the legislature's intent, for it is not the intent of the individual legislators that governs, but the intent of the legislature as formally enacted into law[.]" *Id*. In construing text, unless a word or phrase has a specialized meaning, we typically give "words of common usage" their "plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

The second step is to consider any pertinent legislative history that the parties have identified or that we have found ourselves. *Gaines*, 346 Or at 172, 177-78. "Legislative history may be used to confirm seemingly plain meaning and even to illuminate it" or to show that "superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute." *Id*. at 172. However, "[w]hen the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different." *Id*. at 173. "Legislative history may be used to identify or resolve ambiguity in legislation, not to rewrite it." *Halperin v. Pitts*, 352 Or 482, 495, 287 P3d 1069 (2012).

The third and final step—which we take only if the legislative intent "remains unclear after examining text,

context, and legislative history"—is to "resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Gaines*, 346 Or at 172. As we will explain, we need not engage in that step here because the text, context, and legislative history resolve the matter.

We start by considering the "plain, natural and ordinary" meaning of the phrase "combat by agreement." *PGE*, 317 Or at 611. "Combat" is defined as "to fight with," "battle," or "struggle against or oppose especially by argument." *Webster's Third New Int'l Dictionary* 452 (unabridged ed 2002). Relevant definitions of "agreement" include "the act of agreeing or coming to a mutual arrangement," "an arrangement (as between two or more parties) as to a course of action," and "the written or oral phraseology embodying reciprocal promises*." Id.* at 43.

Next, the legislative history makes clear that the legislature took a narrow view of the limitation. The limitation was enacted in 1971 as part of a comprehensive revision of criminal law proposed by the Criminal Law Revision Commission and adopted by the legislature. Or Laws 1971, ch 743, § 24.[3] At a hearing of the Commission's subcommittee that drafted the limitation, the subcommittee members agreed that the purpose of the combat-by-agreement limitation was to address dueling situations "where two people [] agree to have a fight." Minutes, Criminal Law Revision Commission, Subcommittee 1, Sept 9, 1969, 12. The commentary to the preliminary draft notes, "Under subsection (3) neither party to mutually agreeable combat, which is not sanctioned by law, can claim self-defense." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Preliminary Draft No. 1 § 7, 15 (Aug 1969).

On appeal, defendant argues that the Commission's focus was that there must be an agreement to fight *before* the fight begins for the limitation to apply, whereas the state argues that the Commission suggested that any sort of act or arrangement, *made even tacitly during an escalation*, is sufficient to constitute an agreement to engage in combat.

---

[3] The current version of the statute has not changed from what the Commission drafted and proposed. Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 24(3), 23 (July 1970).

At trial, the state argued, and the trial court agreed, that the jury could infer mutual combat from evidence that defendant and AE argued and that both men ultimately used force. We conclude that that interpretation cannot be reconciled with the statutory text.

The word "agreement" denotes mutual assent. Read in context, the statute requires evidence that the parties mutually decided to engage in a fight, not merely that both ultimately used force once a confrontation escalated. Construing the statute otherwise would collapse the distinction the legislature created between a mutual agreement to fight and a rapid escalation of force in which one or both participants respond to perceived threats. If the mere fact that both parties used force were sufficient, the statutory requirement of an "agreement" would have no independent meaning.

We construe "combat by agreement" to mean a mutually consensual decision—express or implied—between two or more individuals to engage in physical fighting, absent lawful authorization. The existence of such an agreement must be established by specific conduct or communication that indicates assent by both parties *prior* to engaging in mutual combat. Mere escalation, provocation, or reaction to an aggressive act or verbal argument does not amount to combat by agreement. The agreement must precede or contemporaneously accompany the physical altercation and reflect a voluntary and shared intent to fight. However, the limitation does *not* encompass a situation where one person starts fighting and the other person fights back. Although that may constitute "mutual combat" in some sense, it is not the circumstance contemplated by the legislature.

The evidence in this record shows, at most, that the encounter escalated from a verbal dispute into violence. Nothing in the record suggests that defendant and AE reached any understanding—explicit or implicit—that they would engage in a fight. The state presented no evidence that the parties arranged the encounter, challenged each other to fight, or otherwise manifested a mutual intention to engage in combat. *Brown*, 327 Or App at 597-98 (explaining that the state bears the burden of disproving self-defense

beyond a reasonable doubt). Because the evidence would not permit a rational juror to find that the confrontation was the product of "combat by agreement," the statutory limitation to self-defense under ORS 161.215 does not apply. Thus, the trial court erred in instructing the jury on the combat-by-agreement limitation.

That error was not harmless. An instructional error is not harmless when the error "probably created an erroneous impression of the law in the minds of the jury and if that erroneous impression may have affected the outcome of the case." *State v. Ramoz*, 367 Or 670, 704-05, 483 P3d 615(2021) (internal quotation marks omitted). By contrast, "[i]nstructional error is harmless if there is little likelihood that it affected the jury's verdict." *State v. Nelson*, 309 Or App 1, 9, 481 P3d 314, *rev den*, 368 Or 511 (2021).

The trial court's giving of the "combat by agreement" instruction, and the prosecutor relying on that instruction in its closing statements, improperly undercut defendant's theory of self-defense and, consequently, the error was not harmless. The trial court's instruction was not only extraneous. Rather, there is more than little likelihood the trial court's erroneous instruction and the prosecutor's reliance on that instruction could have created an erroneous impression in the minds of the jury, resulting in the jury rejecting defendant's claim of self-defense and finding him guilty of first-degree manslaughter and reckless endangerment. It is possible that the jury rejected self-defense on a different, valid basis; however, the jury may well never have reached other issues regarding self-defense because it could so easily find that self-defense was inapplicable due to what it had been told about mutual combat by agreement. The risk is too high on this record for us to say that the error was harmless.

## CONCLUSION

The trial court erred in instructing the jury on the "combat by agreement" limitation to self-defense. Because we reverse on the first assignment of error, we do not reach the second and third assignments of error. Accordingly, we reverse and remand for a new trial.

Reversed and remanded.