Submitted November 15, 2011, affirmed July 25, 2012, *rev den*, 353 Or 209 (2013)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JESSE WILIAM McDANIEL, III,
*Defendant-Appellant.*

Washington County Circuit Court
C090962CR; A143812

283 P3d 414

Peter Gartlan, Chief Defender, and Morgen E. Daniels, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Andrew M. Lavin, Assistant Attorney General, argued the cause for respondent.

Before Sercombe, Presiding Judge, and Brewer, Judge, and Egan, Judge pro tempore.

BREWER, J.

**BREWER, J.**

Defendant appeals from his conviction for one count of unlawful possession of a Schedule I controlled substance, *former* ORS 475.840(3)(a) (2009), *renumbered as* ORS 475.752(3)(a) (2011). In his sole assignment of error, defendant asserts that the trial court erred in denying his motion for a judgment of acquittal because a police officer unlawfully induced him to engage in the charged conduct and, thus, the state did not disprove his defense of entrapment under ORS 161.275. We affirm.

Where a defendant raises the defense of entrapment, "the state has the burden of disproving the defense beyond a reasonable doubt." ORS 161.055(1); *see also State v. Murphy*, 21 Or App 630, 535 P2d 779 (1975). In reviewing the trial court's denial of defendant's motion for judgment of acquittal, we view the evidence in the light most favorable to the state to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Because of the allocation to the state of the burden of proof on defendant's entrapment defense, that inquiry includes the additional question of whether a rational trier of fact could have found that the state disproved the defense beyond a reasonable doubt. *State v. McMullen*, 34 Or App 749, 752, 579 P2d 879 (1978). "When * * * a defendant [moves for a judgment of acquittal] at the close of the state's case, 'the appellate court must consider all the evidence * * *'" adduced at trial. *State v. Bilsborrow*, 230 Or App 413, 418-19, 215 P3d 914 (2009) (citing *State v. Gardner*, 231 Or 193, 195, 372 P2d 783 (1962)).

In the early morning on April 18, 2009, defendant was perusing on his computer the "casual encounters" section of the website Craigslist.[1] Defendant clicked on an advertisement entitled "Looking for the right hookup—w4m." That advertisement read:

"I have tried this before but could not find the right man to come thru. Im looking for some green or X for my kitty.

---

[1] Craigslist is a website where users can post advertisements to which interested parties can respond by e-mail.

Im a horny thing looking for a hookup. Are you that guy that can step up? Lets make this happen 2nite. Kisses."[2]

What defendant did not know was that the advertisement had been posted by Officer Hahn as part of his regular police duties. Defendant responded by e-mail at 6:34 a.m., writing:

"My names Jesse, I'm 26 5' 10 D&D free. * * * Let me know if you are interested."[3]

Hahn, using the fictitious name "Cindy Newsom," responded to defendant at 6:36 a.m., writing:

"Well you sound good so far but I didnt see that have some bud[4] or X for me? Do you have either an enuf to get with me 2nite?"

Approximately three hours later, defendant replied:

"I have the bud couldn't find the X. Let me know if you are still interested. Please send a pic."

Later that day Hahn answered, "I am still interested if you can come up with enuf bud to fuck me, can you make it happen[?]" The next day, April 19, defendant replied to Hahn: "Got the bud if you are still interested."

Because Hahn was off duty for three days, he did not resume his e-mail exchange with defendant until April 22, at 10:34 p.m., writing, "Im still lookin sweety. You wanna hook upstill? Im up alnight." At 11:20 p.m., defendant replied, "[H]ell yeah you got a pic?" Two minutes later, Hahn wrote back, "So wut r u lookin 4? Name ur game. The pic, im the one in the middle with the hat."[5]

---

[2] According to Officer Hahn, who testified at the hearing, "green" is slang for marijuana, "X" is slang for Ecstasy and "kitty" is slang for vagina. Defendant testified that he understood those terms to have those meanings. The officer also testified that "hookup" is a slang term that can mean either "having sex or getting drugs for each other." Defendant testified that "hookup is slang term for hooking up."

We also note that, throughout this opinion, unless otherwise noted, when quoting the communications between defendant and the officer, we retain the spelling, punctuation, and capitalization of those communications.

[3] Defendant testified that "D&D free" is slang for "drug and disease free." Hahn testified that he also understood that term to have that meaning. The ellipsis indicates our omission of defendant's physical description of himself.

[4] The officer testified that "bud" is slang for marijuana. Defendant also testified that he understood that term to have that meaning.

[5] The officer testified that the picture he provided to defendant was of an unidentified woman that he had "got off the internet."

Over the next four hours, the following exchange occurred:

Defendant: "damn your hot i'm down for whatever smoke a little bud and see what happens. I also have xanax, valium[6]"

Defendant: "hey sexy i am up and would love to kick it. you still down?"

Hahn: "Hey, u still there or wut"

Defendant: "that sounds cool all i have is a dime. Im going to call my twin to pick up a 20 sack is that enough? I would love to smoke and have some bomb sex. Text me[.]"

Defendant: "Hello sex for bud sonds good to me how much do you need? waiting ti hear back from you[.]"

Defendant: "Well damn did I just get all this weed for nothing?"

Defendant: "Well let me know if you want to do this another time. Waited but never heard back. I bought a shit load of weed."

On April 23, Hahn wrote:

"Im up early and off to work but Im still down for when i get off 2nite. If you want to make it an alnighter or multiple sex then it will be an ounce. U got a shit load so make it worth it? Deal?"

That evening, the following exchange occurred over a six-hour period.

Defendant: "sounds like a deal. What time and where? I may be able to get some e as well. You are not a cop?"

Hahn: "Oh yeah, we can chill at my place since Ive had a couple shots already and my sis is out of town. Hit me back[.]"

Defendant: "Yeah i wanna come over. 1 is a little late but sounds ok. Anyway to meet earlier? What is your addy? You are not a cop? Do you have another pic?"

Hahn: "You wanna come over say 11p then, I will head home now then, let me know wut ur driving so i can watch

---

[6] Hahn testified that both Xanax and Valium are controlled substances.

4 ya, house is easy to miss. Not a cop by the way, u bring the condoms then. Here is a couple good ones I havent shared with others. U will like"

Defendant: "Lets say 11:45 send me your addy. I am driving a white Honda Accord."

Hahn: "u get the E to?"

Defendant: "about to try and get it. might be a little late."

Defendant: "just got the e u still want to do this?"

Later, on the evening of April 24, defendant drove to the address that Hahn had given him. When defendant arrived, Hahn, who had been waiting in his police cruiser, pulled defendant over, had him step out of the car, and gave him the *Miranda* warnings. Hahn asked defendant what he was doing, and defendant told him he was there to "meet a girl named Cindy that he had met on Craigslist." Hahn then asked defendant if he had any controlled substances with him, and defendant handed over a prescription pill bottle that contained less than an ounce of marijuana. Hahn asked defendant "where the ecstasy was, because he said he was bringing it." Defendant told him that it was at the bottom of the pill bottle; Hahn found one pill there, wrapped in plastic.[7] Defendant was arrested and charged with, among other offenses, possession of a Schedule I controlled substance.

After the state concluded its case-in-chief at trial, defendant moved for a judgment of acquittal, arguing that, "[f]rom the record here, there's no record that [defendant] was predisposed at all to possessing this ecstasy. In fact, all the evidence points to the contrary of that." The trial court denied the motion.

In his own defense, defendant testified that he had used Craigslist to meet people because of his anxiety, for which he had been prescribed Valium and Xanax. Defendant testified that, on the morning of April 18, he had sent replies to "about eight different ads" and that the reply that he sent

---

[7] The pill taken from defendant was later tested and determined to be Benzylpiperazine (BZP), which is similar to Ecstasy in both physical appearance and physiological effect and, like Ecstasy, is a Schedule I controlled substance.

to Hahn "is like the same generic reply that I sent to every ad." He testified that he had never bought Ecstasy before and that he didn't have any marijuana when he replied to the ad, but "this being Portland * * * I knew that somehow I could find it." According to defendant, he went to downtown Portland on April 23 "and looked for people that played the part, like the baggy clothes, and—just kind of asked. * * * I was specifically looking for marijuana at that time. I did ask about the X, but it was—it's not really completely what I was looking for." After Hahn gave him an address, defendant went to downtown Portland again and spent "like about 20 minutes, searching, like asking people, and then bought what—for $20, what I thought was [E]cstasy."

On cross-examination, defendant testified that, in the past, he had received replies to his e-mails in the "casual encounters" section of Craiglist from women who had asked, "[D]o you think you can afford me?" According to defendant, he had replied, "Oh, I don't do that, or stuff like that." The prosecutor then asked defendant:

> Prosecutor: "So when the officer in this case said that he wanted drugs and controlled substances in exchange for sex you didn't say, 'Oh, no. That's not for me,' you continue with the correspondence, correct?"
>
> Defendant: "Yes."

Defendant admitted volunteering to provide the officer with Valium or Xanax. Defendant testified that he had not purchased any marijuana until April 23, when he bought a "20 sack," a quantity of marijuana that, according to defendant, cost $20. Defendant explained his e-mail asking the officer how much marijuana he needed by saying, "[T]hink about it this way. I'm not going to go get something if I know that I'm not meeting someone. * * * I'm not going to go and spent $20, and—that I don't have, or something like that, if I know I'm not meeting someone."

The prosecutor then asked defendant about his final e-mails with the officer.

> Prosecutor: "April 23rd, 6:24pm on Thursday. Do you see that?"
>
> Defendant: "Mm-hmm."

Prosecutor:   "You say, 'it sounds like a deal. What time? May be able to get some E, as well.'"

Defendant:   "Yeah."

Prosecutor:   "Now, at that point, that's not a response to the officer asking you yet again, is it? If you refer to page 12, at the very top, that's what the officer said. Does it, again, ask you there if you have any E, or anything like that?"

Defendant:   "At the top of page 12?"

Prosecutor:   "Yeah."

Defendant:   "No."

Prosecutor:   "So, you just volunteered it there, you might be able to get some E, as well, correct?"

Defendant:   "Because that's what the person said they wanted at the beginning."

Defendant admitted that he used marijuana "months before" he replied to the officer's ad, despite his claim that he was "drug and disease free." The prosecutor asked defendant to explain the e-mail in which he had written, "I would love to smoke and have some bomb sex." The prosecutor asked, "[S]o, you were—you're indicating that you're willing to use drugs, despite saying that you're drug and disease free, correct?" Defendant answered, "[Y]eah." Defendant was convicted by the jury; this appeal followed.

On appeal, defendant contends that, "[b]ecause the state failed to offer evidence sufficient [to prove] that defendant was predisposed to criminally possess a Schedule I controlled substance before 'Cindy' propositioned having sex with him if he obtained it for her," the trial court should have granted his motion for judgment of acquittal. Defendant relies on several federal court cases for the corollary proposition that, because "the relevant time frame for assessing a defendant's disposition comes before he has any contact with government agents," the state failed to meet its burden because it presented no such evidence. The state replies that "the record contains sufficient evidence from which a rational jury could find that the police officer

merely afforded defendant an opportunity to unlawfully possess [BZP]," and, thus, "the officer did not induce defendant's criminal conduct."

The parties' contentions present a question of the proper interpretation of ORS 161.275. Our goal is to determine the intended meaning of the statute by examining its text in context, along with relevant legislative history and, if necessary, other aids to construction. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009).

ORS 161.275 provides:

"(1)   The commission of acts which would otherwise constitute an offense is not criminal if the actor engaged in the proscribed conduct because the actor was induced to do so by a law enforcement official, or by a person acting in cooperation with a law enforcement official, for the purpose of obtaining evidence to be used against the actor in a criminal prosecution.

"(2)   As used in this section, 'induced' means that the actor did not contemplate and would not otherwise have engaged in the proscribed conduct. Merely affording the actor an opportunity to commit an offense does not constitute entrapment."

The dispositive issue on appeal is whether defendant was "induced" within the meaning of ORS 161.275(2). The legislature has defined the term "induced," but it has not defined the terms that, taken together, make up that definition. Accordingly, we give those component terms their ordinary meanings. "Contemplate," as pertinent here, means "to have in view as a purpose : anticipate doing or performing : plan on : INTEND, PLAN." *Webster's Third New Int'l Dictionary* 491 (unabridged ed 2002). "Otherwise," as used in ORS 161.275(2), is an adverb modifying the verb "engaged" in the phrase "would not otherwise have engaged in the proscribed conduct." When so employed, "otherwise" is defined as "in different circumstances : under other conditions." *Id.* at 1598. Finally, ORS 161.275(2) provides that "[m]erely affording the actor an opportunity to commit an offense does not constitute entrapment."

From the statutory text, we discern two aspects of "induced" that the state must disprove beyond a reasonable

doubt. First, the state must disprove beyond a reasonable doubt that the defendant did not "contemplate" the proscribed conduct—that is, that the defendant did not "have in view as a purpose," "anticipate doing or performing," or plan on or intend the proscribed conduct. That aspect of inducement focuses on the defendant's subjective mental state when he or she interacts with the law enforcement official.

Second, the state must disprove beyond a reasonable doubt that the defendant "would not otherwise have engaged in the proscribed conduct"—that is, that, under other conditions or in different circumstances, the defendant would not have acted as he or she did. The final sentence of ORS 161.275(2) qualifies the second inquiry. In examining the defendant's interactions with law enforcement, the trier of fact must determine whether the official's actions constituted "merely affording the [defendant] an opportunity to commit an offense." Thus, even if, in a particular situation, the defendant might not have engaged in the proscribed conduct on his own initiative, the defendant has not been induced if the law enforcement official's actions "merely afforded * * * an opportunity" that the defendant decided to take.

With that understanding of the text of ORS 161.275(2), we turn to its statutory context. *See Gaines*, 346 Or at 171. We construe statutes in light of the preexisting law at the time of their enactment. *See, e.g., Comcast of Oregon II, Inc. v. City of Eugene*, 346 Or 238, 254, 209 P3d 800 (2009) ("[W]e must be mindful of * * * settled law as part of our analysis of statutory context."). Later judicial decisions, because they were not available for consideration by the legislature at the time of enactment, do not bear on the meaning of the statutory text. *See Jones v. General Motors Corp.*, 325 Or 404, 418-19, 939 P2d 608 (1997). In short, we construe ORS 161.275 in light of the common law of entrapment as it existed in Oregon when that statute was enacted.[8]

ORS 161.275 was enacted as part of the Revised Criminal Code in 1971. In the Commentary to the Proposed

---

[8] Thus, defendant's reliance on federal court cases decided decades after the enactment of ORS 161.275 is misplaced.

Oregon Criminal Code, the Criminal Law Revision Commission noted that

> "Section 35 [later enacted as ORS 161.275] restates the doctrines of entrapment which have been recognized in Oregon case law (*e.g.*, *State v. Lebrun*, 245 Or 265, 419 P2d 948, *cert den*, 386 US 1011 (1966); *State v. Murray*, 238 Or 567, 395 P2d 780 (1964); *State v. Beeson*, 106 Or 134, 211 P 907 (1923))."

Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, § 35, 34 (July 1971). During the drafting of the revised code, the members of the commission agreed that section 18 (later renumbered as section 35) was based on the Oregon Supreme Court's discussion of the then-existing federal common law of entrapment in *State v. Lebrun*, 245 Or 265, 419 P2d 948, *cert den*, 386 US 1011 (1966), specifically the court's reliance on two decisions from the Second Circuit Court of Appeals. Minutes, Criminal Law Revision Commission, Dec 13, 1969, 31-33.

In *Lebrun*, the defendant had been convicted of unlawful possession of morphine and argued that he had been entrapped. 245 Or at 266. The issue on review was whether the defendant was entitled to a jury instruction that "an illegal act by the defendant could not warrant a conviction if he were entrapped unless he was previously suspected." *Id.* at 266-67. The defendant had been approached in a bar by an acquaintance, Gast, who introduced him to an undercover police officer. Gast asked the defendant about narcotics, and the defendant replied that he had a supply of "'good' narcotics" and would sell some to the officer, who had offered to buy them. The defendant was arrested when he met the officer to sell him the drugs. *Id.* at 272. The defendant argued that he had been entrapped as a matter of law, because the officer lacked reasonable suspicion to believe that the defendant was engaged in criminal conduct when he offered to buy drugs from him.

The Supreme Court began its analysis by setting out the definition of entrapment described in *Sorrells v. United States*, 287 US 435, 445, 53 S Ct 210, 77 L Ed 413 (1932):

"'*** It is well settled that decoys may be used to entrap criminals, and to present opportunity to one intending or willing to commit crime. But decoys are not permissible to ensnare the innocent and law-abiding into the commission of crime. When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor. ***'"

*Lebrun*, 245 Or at 267 (quoting *Sorrells*, 287 US at 445; omissions in *Sorrells*). The court explained that "'reasonable suspicion,' as we view it, is only an element—an important one it may be—in the consideration of the ultimate question where evidence of entrapment comes into the case." *Id.* at 268. The court observed that, in *Sorrells*,

"the [United States] Supreme Court said that to determine the question of entrapment both the conduct of the officers and the 'predisposition and criminal design of the defendant are relevant'[.] *** The controlling question *** is 'whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials[.]'"

245 Or at 268 (quoting *Sorrells*, 287 US at 451). The court ultimately rejected the defendant's argument, reasoning that

"[n]othing in these statements of the law requires the conclusion that previous suspicion (meaning, we assume, that the accused was a violator of the particular statute involved or some similar statute) or reasonable ground for such suspicion, is an indispensable part of the prosecutor's proof."

*Id.* at 269.

The court then examined two federal decisions, *United States v. Becker*, 62 F2d 1007 (2d Cir 1933), and *United States v. Sherman*, 200 F2d 880 (2d Cir 1933):

"And so Judge Learned Hand in [*Becker*, 62 F2d at 1008,] in considering what would 'excuse' instigation by an officer, said: 'The only excuses that courts have suggested

so far as we can find, are these: an existing course of similar criminal conduct; the accused's already formed design to commit the crime or similar crimes; his willingness to do so, as evinced by ready complaisance.'

"Again, Judge Hand in [*Sherman*, 200 F2d at 882] said that in cases of alleged entrapment two questions of fact arise: '(1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence.' Elaborating on his earlier statement in the *Becker* case, above quoted, Judge Hand said:

> "'* * * As we understand the doctrine it comes to this: that it is a valid reply to the defense, if the prosecution can satisfy the jury that the accused was ready and willing to commit the offence charged, whenever the opportunity offered. In that event the inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose. The proof of this may be by evidence of his past offences, of his preparation, even of his 'ready complaisance.' Obviously, it is not necessary that the past offences proved shall be precisely the same as that charged, provided they are near enough in kind to support an inference that his purpose included offences of the sort charged.' [*Sherman*,] 200 F2d at 882."

*Lebrun*, 245 Or at 269-270 (omission in *Sherman*; footnote omitted).

After surveying the pertinent cases, the court concluded

> "The instant case affords a good illustration why such an instruction as the defendant requested should not be given. The defendant is the same Phillip LeBrun whose conviction of larceny in an office was reversed by this court because his confession to that crime was erroneously admitted in evidence[.] * * * The property he was convicted of stealing was narcotics.
>
> "* * * * *

"The defendant's testimony is not convincing in cold print and evidently was not believed by the jury. The whole record presents a picture, not of a man who was overpersuaded by the police into committing a crime which he otherwise would not have committed, but of one ready, able and willing to seize the opportunity to make a sale of the narcotics in his possession. Yet, it could have been found by the jury that at the time the negotiations commenced Officer Giani did not suspect the defendant of being a law violator or have reasonable cause for such suspicion. Those elements should not be a prerequisite to the prosecution's reply to a defense of entrapment."

*Id.* at 272-73.

*Lebrun* and the cases on which the court relied there confirm that, when ORS 161.275(2) was enacted, evidence of a defendant's past offenses, of his preparation, even of his "'ready complaisance'" was relevant to the question of whether a defendant contemplated or would not otherwise have engaged in the conduct. *Id.* at 269 (quoting *Sherman*, 200 F2d at 882). Moreover, the court endorsed the principle that "'it is not necessary that the past offences proved shall be precisely the same as that charged, provided they are near enough in kind to support an inference that his purpose included offences of the sort charged.'" *Id.* at 270 (quoting *Sherman*, 200 F2d at 882).[9]

The Criminal Law Revision Commission relied on those principles in enacting ORS 161.275(2). The commission thus adopted the view that the determination whether a defendant contemplated or would not otherwise have engaged in the proscribed conduct is not limited to whether the defendant contemplated the precise conduct with which he or she ultimately was charged. What the defendant contemplated need only be "'near enough in kind to support an inference'" that the defendant's "'purpose included

_____

[9] After the enactment of ORS 161.275(2), this court has elaborated on the kinds of evidence that can give rise to an inference that a defendant was predisposed to engage in the charged conduct. *See, e.g., State v. Barr,* 62 Or App 46, 49-50, 660 P2d 169 (1983) (rejecting jury instruction that permitted jury to find predisposition from *any,* rather than just similar or related, prior criminal conduct); *State v. Moore,* 103 Or App 440, 445, 979 P2d 1073 (1990), *rev den,* 311 Or 151 (1991) (cross-examination regarding whether defendant's wife suspected him of infidelity was not related to entrapment defense where defendant was charged with possession and delivery of cocaine).

offences of the sort charged.'" *Lebrun*, 245 Or at 270 (quoting *Sherman*, 200 F2d at 882). Furthermore, a defendant's "'ready complaisance'" is also relevant to whether or not he or she was induced—that is, if the defendant readily accepted a decoy's offer to commit an offense, a trier of fact may infer that he or she has not been induced. *Id.* (quoting *Becker*, 62 F2d 1008). Put another way, it is more likely that a law enforcement official's actions "merely constituted affording [the defendant] an opportunity to commit an offense," ORS 161.275(2), if the defendant readily agreed to engage in the charged conduct or conduct that is near enough in kind to the charged conduct to support an inference that he or she contemplated the charged conduct.

Later decisions construing ORS 161.275 are consistent with those principles. In *State v. Davis*, 14 Or App 422, 430, 512 P2d 1366 (1973), we upheld the trial court's refusal to instruct the jury on entrapment. In that case, an undercover agent had learned from an informant that a heroin sale was going to take place at an apartment. *Id.* at 424. The agent went to the apartment, where he met the informant and the defendant. *Id.* The agent told the defendant that he was interested in buying heroin, and the defendant asked how much he wanted. *Id.* Not knowing how much heroin the defendant had, the agent asked for two bags. *Id.* The defendant handed the agent two bags, and the agent gave him $20 in return. *Id.* We concluded that the defendant was not entitled to an entrapment instruction because the defendant had agreed to the transaction and also had implicitly understood that the price for the two bags of heroin was $20. *Id.* at 429-30.

*State v. Gunn*, 15 Or App 174, 175, 515 P2d 187 (1973), is also instructive. There, we rejected the defendant's argument that he had been entrapped as a matter of law. In that case, the defendant and two companions were hitch hiking in Portland when they were picked up by two undercover police officers. The officers asked the defendant if he knew where "they could obtain some marihuana or hashish," and the defendant directed them to an address, went inside, and returned to the car with two grams of

hashish. *Id.* at 176. We concluded that the defendant had not been entrapped because,

> "[i]mmediately upon being asked by undercover police officers whether he could assist them in obtaining drugs, and without any other inducement, defendant directed them to a source and actively participated in the exchange of hashish for money. At most, this evidence raises a question of fact, not one of law; and the trier of fact was not required to resolve that question in defendant's favor."

*Id.* at 177.

In light of that case law and our textual analysis of ORS 161.275(2), we examine the evidence in this case. As noted, defendant argues that the only evidence that showed any unlawful predisposition on his part was his possession of a small amount of marijuana. Defendant argues that he only possessed the substance that he believed to be Ecstasy "after several days of suggestive emails, and only after 'Cindy' asked him repeatedly to obtain it."

Although the inquiry under ORS 161.275(2) focuses on defendant's subjective state of mind when he first interacted with Hahn, the circumstances of that interaction and their later exchange are relevant insofar as they illuminate defendant's state of mind at the outset. Significantly, defendant clicked on an ad that explicitly proposed an exchange of drugs for sex. Although defendant testified that he did not read the ad before replying, the jury would not be required to believe him. Moreover, after defendant sent what he called his "standard reply" and received a second e-mail from Hahn mentioning "bud or X," defendant did not end the communication. Instead defendant replied, three hours later, "I have the bud couldn't find the X." From that exchange, which took place within a three-hour period in which the first three e-mails were exchanged within five minutes, a rational trier of fact could find that defendant was predisposed to possess Ecstasy. That defendant claimed he was drug and disease free does not undermine that inference: regardless of whether a trier of fact believed defendant, it could be found that he was predisposed to possess drugs, not for personal use, but as a medium of exchange.

Defendant's statements throughout the e-mail exchange also reinforced the inference that he was predisposed to commit the charged conduct. Like the defendant in *Davis*, defendant's statements indicated implicit knowledge of the cost and commonly exchanged quantities of controlled substances. Importantly, and contrary to defendant's reading of the record, he reintroduced the topic of Ecstasy into the exchange in his April 23 e-mail in which he stated, "I may be able to get some e as well." Before then, defendant and the officer were corresponding about the marijuana that defendant claimed he was purchasing and how much marijuana would be sufficient to consummate their encounter. Indeed, early on in the e-mail exchange, defendant had offered to provide Hahn with Xanax and Valium, both of which are controlled substances. Hahn had never mentioned either substance. Thus, the evidence permitted an inference that defendant was willing to possess large amounts of marijuana *and* other controlled substances, including substances of the kind he was charged with possessing. In short, the evidence was sufficient for a rational trier of fact to find that the state disproved defendant's entrapment defense beyond a reasonable doubt.

Affirmed.