Argued and submitted March 16, 2015, convictions for first-degree criminal
mistreatment reversed and remanded; otherwise affirmed August 3, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MITCHELL A. BEVIL,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1100839; A153231

376 P3d 294

Steven L. Maurer, Judge. (Judgment)

Thomas J. Rastetter, Judge. (Amended Judgment)

Morgen E. Daniels, Deputy Public Defender, argued the
cause for appellant. With her on the brief was Peter Gartlan,
Chief Defender, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

## DUNCAN, P. J.

This case presents a question of first impression regarding the reach of Oregon's first-degree criminal mistreatment statute, which, among other things, makes it a Class C felony for any person who has assumed the care of an elderly person to "take[] the [elderly person's] money or property for, or appropriate the money or property to, any use or purpose not in the due care and lawful execution of the person's responsibility." ORS 163.205(1)(b)(D). Defendant was convicted under that statute after accepting substantial amounts of money from an elderly woman who was dependent on him for her physical care. The trial court, when conducting the bench trial, ruled that the statute effectively prevents a caregiver from lawfully receiving any gifts from an elderly person in his or her care, regardless of whether the caregiver engaged in wrongful conduct.

On appeal, defendant argues that the statute was not intended to create a strict-liability crime for caretakers—including children of elderly persons—who knowingly receive gifts from persons in their care. The state defends the trial court's reading of the statute, arguing that the legislature could have exempted gifts from its reach but instead "enacted a much broader statute, which prohibits *any* taking of money for *any* purpose outside of caretaking duties regardless of the existence of consent." (Emphases by the state.) We agree with defendant that the legislature did not intend the statute to sweep as broadly as the state contends and that the trial court applied the wrong legal standard when it found defendant guilty of first-degree criminal mistreatment. Accordingly, we reverse and remand.

## BACKGROUND

We provide only a brief summary of the events giving rise to the issue on appeal, which ultimately reduces to a question of statutory interpretation.[1] Defendant met the alleged victim, Howser, through a mutual friend, Kosta, who was also Howser's neighbor. Howser was a wealthy

---

[1] As later explained, defendant's brief arguably raises a question regarding the sufficiency of the evidence, but we reject that argument without extended discussion. 280 Or App at 100 n 3.

elderly woman who lived alone on an "extensive property," and Kosta knew that she was in need of a groundskeeper and believed that defendant would be a "good fit."

Defendant began working for Howser in 2007 and, within the next two years, his role developed from groundskeeper into caretaker. In addition to maintaining Howser's house and yard, defendant was her primary social contact, arranged all of her appointments, including medical appointments, and handled her finances—including accompanying her to the bank, filling out the payee line of checks for her signature, and arranging the sale of real property. Howser introduced defendant as her "nephew" to make it easier for him to participate in discussions with Howser's doctors and financial advisers, and defendant did the same.

Between April 2009 and April 2010, various large checks from Howser's bank account were made out to defendant, each bearing Howser's signature: a check for $75,000, two checks for $50,000 each, three checks for $25,000 each, and a check for $10,000.

In May 2010, Howser fell and was taken to the emergency room, where an MRI indicated that she had fractured her hip. Defendant, representing that he was Howser's nephew, wanted to take Howser home rather than admit her to the hospital, against medical advice. A hospital social worker became involved and learned that defendant was not, in fact, Howser's legal nephew. The social worker reported the matter to Adult Protective Services, and an investigator responded to the report and interviewed defendant at the hospital. Howser died the following day from complications during surgery related to her fall.

The following month, a Clackamas County sheriff's detective began a criminal investigation of defendant concerning financial exploitation of Howser. During an initial interview with the detective, defendant first denied receiving large gifts from Howser but later admitted receiving two $50,000 checks. The detective later returned to defendant's home and confronted defendant with evidence of the seven checks between April 2009 and April 2010, which totaled $260,000. Police executed a search warrant at the home several days later and discovered a cashier's check in the

amount of $161,000 hidden between plates in defendant's kitchen cabinets.

Defendant subsequently was charged with seven counts of aggravated first-degree theft, one for each of the seven checks from Howser. ORS 164.057. The same checks were the bases for seven counts of first-degree criminal mistreatment under ORS 163.205(1)(b)(D).[2] Each of the first-degree criminal mistreatment counts alleged, in the language of the statute, that defendant, "having assumed the care, custody, and responsibility for the supervision of * * * Howser, a dependent and elderly person, did unlawfully and knowingly take for and appropriate to a use and purpose not in the due and lawful execution of the defendant's responsibility money belonging to * * * Howser."

Defendant waived his right to a jury trial, and the case was tried to the court. At trial, the state presented evidence in support of its theory that Howser was in poor health, was forgetful at times, and was largely dependent on defendant for her physical care. The state also presented evidence that Howser had been careful with her finances before meeting defendant, and that the large checks to him, and other expenditures in which he was involved, were inconsistent with her previous habits. Defendant, on the other hand, presented evidence that Howser was "financially astute," that she had been generous to people who helped her, and, having no natural heirs, had gifted money to defendant because she considered him like family.

In the prosecutor's closing argument to the trial court, she explained that, for purposes of the counts of criminal mistreatment, "those gifts, as [defendant] calls them, were actually a misappropriation of [Howser's] money," because "the money was disappearing very quickly. It was being spent faster than it was coming in." The prosecutor then argued:

"And it's our—it's my position that [defendant] cannot hide behind the gift shield because he had assumed the care of an elderly and dependent person. And this is a different

---

[2] Defendant was charged with, and acquitted of, additional offenses separate from the checks.

situation than giving gifts to a relative or other people [to whom Howser had made gifts], because those people had not assumed her care and they did not have that same duty. *And once you assume that role of caregiver and caretaker, you lose that ability to accept these type of gifts, and it's like a trustee type relationship.*"

(Emphasis added.)

After arguing that the so-called "gifts" made "no sense," the prosecutor explicitly argued that the court could find defendant guilty of the charges of first-degree criminal mistreatment regardless of whether the checks were truly gifts:

"And as it applies to criminal mistreatment, Your Honor, even if you find that all of these checks and all of this money was given to [defendant] as gifts, and I'm not arguing that they were, but I'm saying that even if Your Honor finds that all this—*all this was a gift and that Ms. Howser was lucid, she knew what was happening, that there was no undue influence, the defendant is still guilty of criminal mistreatment in the first degree.* Because by taking her money, that amount of money during the time that she was alive, was a misappropriation of her funds and it was a breach of his responsibility as her caretaker. That is why professional caretakers are prohibited from accepting gifts, because there has to be something preventing elderly people from becoming attached or other people becoming attached to an elderly person and giving away all the money that they need for their care as they get older."

(Emphasis added.)

The court and the parties later engaged in an extensive colloquy regarding the requisite proof for a claim of first-degree criminal mistreatment. They began by exploring what constitutes "care, custody, and supervision" of an elderly or dependent person under ORS 163.205(1)(b)(D), but their focus soon turned to the state's theory that a caretaker relationship "creates what would normally be considered a fiduciary relationship and then prohibits any acceptance of a gift."

The prosecutor initially suggested that certain gifts might be permissibly received—for instance, Howser had given defendant money for an eye surgery, which the

state had not charged as a count of first-degree criminal mistreatment. When pressed by the court on the distinction between that gift and the checks, the prosecutor was unable to articulate a meaningful distinction; she eventually conceded that "technically it would be criminal" under her view of the statute, because defendant had assumed a caretaking role for Howser. At that point, the court posed the following question:

> "If somebody takes without the knowledge of a person, their property, or cash or forges their name to documents to effect withdrawal of funds, that is taking. *But is receiving—does take include the acceptance of a gift? If all the other—if all the other components of a gift are met, does the acceptance of a gift constitute taking and misappropriation in this isolated area?*"

The prosecutor responded, "Yes." The court then asked whether the state's position was that, even if Howser had made all of her own financial decisions, the existence of the caretaker relationship would "be sufficient to preclude [defendant] accepting what, in all other respects, would be potentially legally a valid gift, even though he exercised no control over her finances." And the prosecutor again responded, "Yes."

Defense counsel responded by pointing out the significant ramifications of the state's theory of criminal mistreatment, particularly for persons caring for aging parents. He posed the example of caring for his own mother: If his mother moved in with him and was dependent on him for care, and then "gives me a Christmas present, $100, a check for $100. Have I stepped over the line?"

The court then recessed briefly for the parties to further research the application and meaning of the statute. Once back on the record, the court continued to question the prosecutor about her theory that all gifts to caretakers were prohibited, including how the requisite mental state would apply to such a case, and the prosecutor maintained that all knowingly received gifts from the elderly or dependent person were criminal under the statute. Defense counsel, for his part, reiterated that the statute does not criminalize the receipt of a "valid gift."

The trial court ultimately acquitted defendant of the theft charges, but it agreed with the state's understanding of first-degree criminal mistreatment under ORS 163.205(1)(b)(D) and found defendant guilty of each of the counts based on receipt of the checks. In reciting its findings, the court explained its view that the legislature had intended to "create a level of protection of dependent and elderly persons that might well be seen as beyond that normally associated with a criminal statute," because of the potential for a dependent and elderly person to be swayed by a caregiver.

The court recognized that "as a practical matter, even family members who would be normally the object of an individual's donative intent" would be precluded from receiving gifts from the elderly or dependent person in their care. Nonetheless, the court concluded that the legislature intended the statute to sweep broadly to carry out its remedial intent. The court reasoned:

> "[C]ertainly the legislature could have written this with some greater level of circumspection and could have been less absolute in the use of the funds. But here is—simply takes the money or property for any use or purpose, any use or purpose, other than—not in the due and lawful execution of the person's responsibility. And so I think that, in those absolute terms, that the takes includes an acceptance of what, in a different context, might have been properly seen as a gift, but I believe in this particular instance and in this relationship, that these simply cannot be seen as lawful gifts and are, in fact, a product of the relationship in the nature that was precisely that, that the legislature was intended—intending to prevent from working to an elderly or dependent person's disadvantage."

The court explained the legal standard that it had applied, stating:

> "What I'm finding is that all that needs to be demonstrated here is that the defendant understood and knew that he had accepted the care, custody, responsibility for the supervision of * * * Howser, a dependent and elderly person, and that he took money of hers for a purpose other than that related to her care."

The trial court entered a judgment of conviction on the seven counts of first-degree criminal mistreatment, and it sentenced defendant to 36 months in prison. The court further ordered defendant to pay restitution in the amount of $260,000 to Howser's trust.[3]

On appeal, defendant argues, as he did below, that ORS 163.205(1)(b)(D) was not intended to prohibit "valid gifts" from an elderly person to that person's caretaker. The state defends the trial court's reasoning, arguing that the text of the statute unambiguously bars caretakers from taking any money from dependent persons for any reason unrelated to their execution of caretaking responsibilities. And the legislative history, according to the state, confirms that reading of the text.

In construing the meaning of ORS 163.205(1)(b)(D), we examine the text, context, and any helpful legislative history of the statute. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (setting forth the methodology for construing statutes). The text of ORS 163.205(1) provides, in part:

"A person commits the crime of criminal mistreatment in the first degree if:

"* * * * *

"(b)   The person, in violation of a legal duty to provide care for a dependent person or elderly person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, intentionally or knowingly:

"* * * * *

"(D)   Hides the dependent person's or elderly person's money or property or takes the money or property for, or appropriates the money or property to, any use or purpose not in the due and lawful execution of the person's responsibility[.]"

---

[3] On appeal, defendant also challenges the trial court's award of restitution to the trust, on the ground that the trust is not a "victim" for purposes of the restitution statutes. Our reversal with regard to defendant's assignment of error regarding the criminal mistreatment statute obviates the need to address his argument regarding the award of restitution based on the convictions.

Here, there is no dispute that defendant assumed the care of Howser, an elderly and dependent person. The question before us reduces to the scope of subparagraph (D), particularly the meaning of the word "takes." According to the state, "the verb 'takes' broadly means 'to get into one's hand or one's hold or possession by a physical act of simple transference' or 'to transfer into one's own keeping.'" (Quoting *Webster's Third New Int'l Dictionary* 2330 (unabridged ed 1993)). As the state views the statute, that broad meaning, coupled with the other terms in the statute—"any use or purpose" that is not in the "due and lawful execution of the person's responsibility"—unambiguously prevents a caregiver from accepting any money from a dependent person for the caregiver's own benefit.

The word "take" can be understood as broadly as the state suggests—that is, to include the acceptance or receipt of a gift. *See Webster's* at 2230 (providing an alternative meaning of "take" as "to receive or accept whether willingly or reluctantly (as something given, offered, proposed, or administered * * * <*took* the present but didn't seem pleased with it>"). However, in the context of criminal statutes that refer to the taking of property, the term is generally understood to be limited to transfers that are effected *without the consent* of the owner of the property.

Oregon's theft statutes have long used the word "take" to refer to acts that are undertaken without the voluntary consent of the owner. *See* ORS 164.015 ("A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person: (1) Takes, appropriates, obtains or withholds such property from an owner thereof."). And, at the time that the legislature enacted ORS 163.205(1)(b)(D), that was the commonly understood meaning of the term in the context of misappropriated property under the criminal law. *Black's Law Dictionary* explained that "take" "has many shades of meaning, with the precise meaning which it is to bear in any case depending on the subject with respect to which it is used; *e.g.*, eminent domain; larceny; arrest." *Black's Law Dictionary* 1453 (6th ed 1990). Specifically,

"[i]n the law of larceny, to obtain or assume possession of a chattel unlawfully, *and without the owner's consent*; to appropriate things to one's own use with felonious intent. * * * A 'taking' may occur when a person with a preconceived design to appropriate property to his own use obtains possession of it by means of fraud or trickery * * *."

*Id.* (emphasis added).

It is at least plausible, then, that the legislature used the word "takes," in the context of a criminal statute, to refer to circumstances in which a caretaker takes into his or her possession the property of an elderly or dependent person *without that person's voluntary consent.* And, based on the legislative history of the statute, we are persuaded that that use of the word "takes" is not only plausible; it is what the legislature understood to be the reach of the statute.

ORS 163.205(1)(b)(D) was enacted as part of a broader amendment to the criminal mistreatment statute to address the problem of elder abuse—particularly the "abandonment and financial exploitation of elderly and dependent persons." House Committee on Judiciary, Subcommittee on Crime and Corrections, Staff Measure Summary, HB 2318, Feb 22, 1993. Throughout the public testimony and the workgroup meetings, those in favor of the bill specifically identified the problem of financial "exploitation"—a word that carries a different connotation than the receipt of a truly voluntary gift. *See Webster's* at 802 (defining exploitation in this context to refer to "an unjust or improper use of another person for one's own profit"). Moreover, in each of the examples provided to the House and Senate committees, or discussed by their members, financial "exploitation" took the form of embezzlement or other acts that were taken without the knowledge or voluntary consent of the elderly person—such as when the elderly person's competency was compromised by Alzheimer's disease or other age-related factors. *E.g.*, Testimony, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Feb 22, 1993, Ex B (statement of Pam Edens, Oregon Alzheimer's Public Policy Committee) ("Many persons make sales, target for contributions, or have possessions signed over

when the person is *not cognitively able to make such decisions.*" (Emphasis added.)); Testimony, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Mar 31, 1993, Ex G (statement of Bertrand Copp) (describing the "confidence game" whereby elderly persons are deceived by false promises that someone will care for them and are then left with nothing). At no point, however, did any of the committee discussions or floor debates suggest that the drafters intended to prevent fully competent persons from making gifts of their choice merely because they were elderly or physically dependent on others.

If anything, the legislative history reflects a sensitivity toward protecting the free will of elderly or dependent persons to spend their resources according to their desires. During the first public hearing on the bill, Representative Bob Tiernan expressed concern about striking an appropriate balance between allowing elderly persons to make independent financial decisions and targeting those persons who exploit them. He noted that what constitutes excessive spending to some is not necessarily considered excessive by others. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Feb 22, 1993, Tape 30, Side B (statement of Rep Bob Tiernan). Pam Edens, from the Oregon Alzheimer's Public Policy Committee, agreed that "there [was] a fine line between an individual choosing to do what they want to with their own money and maybe someone taking advantage of it." *Id.* (statement of Pam Edens). Edens suggested that, for purposes of crafting a definition of financial exploitation, "competency" would be a place to start. *Id.* (statement of Pam Edens).

The subsequent history of the bill reflects the legislature's effort to craft a definition of financial exploitation that was broad enough to cover abuse without being overly inclusive. An early draft of the bill would have criminalized "spend[ing] or us[ing] the property or assets of a dependent person or elderly person without the express, voluntary consent of the person or the consent of a legally authorized representative of the person." HB 2318 (1993), -4 amendments (Apr 6, 1993). During a work session before the House Judiciary Committee, committee counsel Holly

Robinson provided an overview of that language, which, she explained, "overlapped" with theft statutes and dealt with consent prior to using monies. Tape Recording, House Committee on Judiciary, HB 2318, Apr 12, 1993, Tape 22, Side A (statement of Holly Robinson). During the work session, however, Representative Del Parks expressed concern over the "express consent" language, in light of the informal arrangements that are often made in the real world, particularly in the case of children who are caring for aging parents and often act with implied but not express consent of their parents. Tape Recording, House Committee on Judiciary, HB 2318, Apr 12, 1993, Tape 22, Side A (statement of Rep Del Parks). The bill was then sent back to the subcommittee, apparently because of the concerns regarding express versus implied consent and to consider whether the statute could be narrowed, possibly to "excessive spending." *See* Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Apr 21, 1993, Tape 84, Side A (statement of committee counsel Holly Robinson) (explaining concerns about language requiring "express voluntary consent" and possibility of limiting statute to excessive spending).

In an effort to address the full committee's concerns about requiring "express voluntary consent," committee counsel proposed language from California's elder abuse statute. That statute defined financial abuse to include the circumstance when "[a] person who has the care and custody of, or who stands in a position of trust to an elder or dependent adult, *takes, hides, or appropriates* the person's money or property to *any use or purpose not in the due and lawful execution of his or her responsibility.*" Exhibit J, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Apr 21, 1993 (emphasis added; internal quotation marks omitted). The subcommittee agreed to adopt language similar to the California statute, with the understanding that it resolved the full committee's concerns about the language requiring "express voluntary consent." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2318, Apr 21, 1993, Tape 84, Side A (statements of committee counsel Holly Robinson and Rep Bob Tiernan).

The bill returned to the House Judiciary Committee with the language that now appears as ORS 163.205(1)(b)(D), and the amendment was adopted by that committee. The House and Senate subsequently enacted that language, following the carriers' repeated representations that the statute addressed "financial exploitation." Tape Recording, House Floor Debate, May 10, 1993 (statement of Rep Bob Tiernen); Senate Floor Debate, HB 2318, July 1, 1993 (statement of Sen Catherine Webber).

In short, nothing in the legislative history of ORS 163.205(1)(b)(D) suggests that the legislature intended to criminalize the receipt of gifts that were the product of the voluntary consent of an elderly or dependent person. To the contrary, the legislature was sensitive to the ability of competent persons to "consent" to spending their money as they chose, and it would not have understood the word "take" in ORS 163.205(1)(b)(D) to sweep so broadly that it intruded on that freedom of choice. Thus, we hold that a person does not "take" property for purposes of ORS 163.205(1)(b)(D) when that property is gifted with the voluntary consent of its owner.

Accordingly, we conclude that the trial court applied an incorrect legal standard when it found defendant guilty of first-degree criminal mistreatment. As described above, the trial court concluded that ORS 163.205(1)(b)(D) precludes the "acceptance of what, in a different context, might have been properly seen as a gift," and it found defendant guilty based on the mere fact that he had received the checks while in a caretaking role, regardless of whether the checks were valid gifts. That was error. As explained, in ORS 163.205(1)(b)(D), the legislature used the word "takes" to refer to circumstances in which a caretaker takes into his or her possession the property of an elderly or dependent person without that person's voluntary consent.

Because a person cannot be found guilty under ORS 163.205(1)(b)(D) based on that person's receipt of a voluntary gift, the convictions for first-degree criminal mistreatment cannot stand, and we must reverse and remand for a new trial, applying the correct legal standard for first-degree criminal mistreatment, under which, if the state's theory is

that the defendant took property of an elderly or dependent person, the state must prove that the defendant obtained possession of the property without the voluntary consent of the elderly or dependent person.[4]

Convictions for first-degree criminal mistreatment reversed and remanded; otherwise affirmed.

---

[4] At the conclusion of his argument in support of his first assignment of error, defendant asserts that the proper remedy is a reversal and remand for a new trial. But, at the end of his brief, defendant "asks this court to reverse his convictions and remand his case to the trial court for entry of a judgment of acquittal. In the alternative, defendant asks this court to remand his case for a new trial." We reject defendant's suggestion that we should reverse and remand for entry of a judgment of acquittal because defendant has not assigned error to the denial of a motion for a judgment of acquittal or developed any argument regarding why the evidence in the record is legally insufficient to support convictions for first-degree criminal mistreatment under the proper legal standard.

We acknowledge that the trial court acquitted defendant on the theft charges based on the same checks and, in doing so, indicated that it did not believe that the checks were the product of undue influence. However, because the basis for the court's acquittal on the theft counts is ambiguous, and because defendant has not developed any argument as to how the court's verdicts on those charges might affect the first-degree criminal mistreatment counts, we do not address that issue.