76 June 5, 2024 No. 377

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Dan SCHULTZ,
*Plaintiff-Respondent,*

*v.*

Joi SCOTT
and all occupants,
*Defendant-Appellant.*

Umatilla County Circuit Court
22LT00054; A178013

Eva J. Temple, Judge.

Argued and submitted July 27, 2023.

Elizabeth Lewis argued the cause for appellant. Also on the brief was Emily Rena-Dozier.

Nick R. Blanc argued the cause for respondent. Also on the brief was The Blanc Firm, LLC.

Before Joyce, Presiding Judge, and Jacquot, Judge, and Armstrong, Senior Judge.

JACQUOT, J.

Affirmed.

**JACQUOT, J.**

In this case under the Residential Landlord Tenant Act (RLTA), plaintiff landlord sought to evict defendant tenant from her dwelling unit, which was part of a house, because landlord intended to move into the house and occupy it as his primary residence. The trial court entered judgment in favor of landlord. On appeal, in two assignments of error, tenant contends that the court erred in (1) denying her motion for involuntary dismissal because the court did not receive a copy of the notice of termination of tenancy into evidence, instead taking judicial notice of it, and (2) misconstruing ORS 90.427(5)(c). ORS 90.427(5)(c) allows landlords, with specific notice and subject to other requirements, to evict a tenant when "[t]he landlord intends for the landlord or a member of the landlord's immediate family to occupy the dwelling unit as a primary residence" and "the landlord does not own a comparable unit in the same building that is available for occupancy at the same time that the tenant receives notice to terminate the tenancy."

As to tenant's first assignment of error, although the trial court denied the motion to dismiss based on a plain error—taking judicial notice of the contents of the notice of eviction—we decline to exercise our discretion to correct the error because to do so now would give tenant more relief than she would have obtained if she had objected to the error in the trial court. As to tenant's second assignment of error, we reject tenant's narrow contention that ORS 90.427(5)(c)'s reference to a "comparable unit in the same building" means any unit in the same building as the tenant's unit, and we conclude that the trial court correctly determined that ORS 90.427(5)(c) was satisfied by landlord's intention to occupy the whole house—a single integrated living space that included the space that made up tenant's dwelling unit—as a primary residence. Accordingly, we affirm.[1]

---

[1] We reject landlord's assertion that this appeal is moot because, after the trial court's decision, tenant voluntarily vacated the premises. In an action, like this one, for forcible entry and detainer, physical possession and the right to possession are distinct issues. *Greene v. Hren*, 224 Or App 223, 228, 197 P3d 1118 (2008). While tenant's vacation of the premises has resolved the issue of physical possession, the issue of whether the trial court properly determined whether landlord met his burden in asserting his right to possession is not moot. *Pendergrass v. Fagan*, 218 Or App 533, 536-37, 180 P3d 110, *rev den*, 344 Or

## JUDICIAL NOTICE

We begin with tenant's first assignment of error. We summarize the procedural facts relevant to this assignment; we provide additional facts below, in our discussion of the second assignment of error.

Landlord sought to evict tenant pursuant to ORS 90.427(5)(c). To prove their case, a landlord must prove that the tenant received a notice that included specific information. *C.O. Homes, LLC v. Cleveland*, 366 Or 207, 218, 460 P3d 494 (2020) ("[T]o prove that a landlord is entitled to possession, the landlord must prove * * * that it delivered a particular, valid notice that effectively terminated the rental agreement."); *see also* ORS 90.427 (specifying notice and other requirements).

At the start of trial, landlord asked the court to take judicial notice of the notice of termination of tenancy that had been filed with the complaint, which was available in the court file. Tenant did not object, and the court took judicial notice of the notice of termination. Landlord then presented his case, testifying, among other things, that he had had the notice served on tenant. After landlord's case was complete, tenant moved to dismiss "on the basis that [landlord] did not introduce the notice into evidence." The court responded that landlord had asked the court to take judicial notice of the notice, that it was "part of the Court's record," and that it was talking about the document "attached to the complaint." Tenant did not raise any further objection. Tenant then testified. On cross-examination, she acknowledged that she had received the notice of termination.

On appeal, tenant contends that the trial court erred in denying the motion for involuntary dismissal based on the substance of the judicially noticed notice of termination. Tenant contends that she preserved the argument that she makes on appeal and, alternatively, requests that, if we conclude that the error was not preserved, we correct it as plain error.

---

670 (2008). Additionally, tenant remains liable for court-awarded costs and fees, and that liability depends on our determination on the merits of the question on appeal. *Ramsum v. Woldridge*, 222 Or App 109, 114-15, 192 P3d 851 (2008).

We conclude that the error was not preserved. In response to tenant's motion to dismiss, the court explained that the notice, and its contents, were in the record because the court had taken judicial notice of them. At that point, tenant had an opportunity to alert the court and landlord to their mistake in relying on judicial notice to make the substance of the notice of termination part of the trial court record, but she did not do that. *See Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) ("[p]reservation gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether" and "ensures fairness to an opposing party, by permitting the opposing party to respond to a contention").

"Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000); ORAP 5.45(1) (allowing discretionary review of "plain" errors). An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). It is a matter of discretion whether we will correct a plain error. *State v. Gornick*, 340 Or 160, 166, 130 P3d 780 (2006).

We agree with tenant that the court plainly erred in relying on the substance of the judicially noticed notice of termination to deny the motion for involuntary dismissal. *See Frady v. Frady,* 185 Or App 245, 248, 58 P3d 849 (2002) (although a court may take judicial notice of a document in a court file, it is "not authorized by that means to consider as evidence the contents of that document"); *see also Petersen v. Crook County*, 172 Or App 44, 51, 17 P3d 563 (2001) (the reason for that rule is that, while it may be indisputable that a document entered into the court file exists, the truth of the statements that document contains may be in dispute (citing Laird C. Kirkpatrick, *Oregon Evidence* 47 (3d ed 1996))).

Nevertheless, we decline to correct the error because to do so would not serve the ends of justice. If tenant had alerted the court to its error, the court easily could, and likely would, have remedied it by allowing landlord to reopen his case, authenticate the notice, and formally put a

copy of it into evidence. To correct the error now would give tenant more relief than she would have received if she had raised the issue in the trial court. For similar reasons, the error was not grave, because tenant had access to the notice and had both the motivation and the opportunity to challenge the giving of and the contents of the notice during her testimony. Accordingly, we decline to correct the error.

## CONSTRUCTION OF ORS 90.427(5)(c)

We next consider tenant's second assignment of error. Tenant challenges the trial court's construction of ORS 90.427(5)(c), an issue that she raised during closing argument to the trial court. Under these circumstances, we consider her closing argument to have included a challenge to the trial court's instructions to itself. Accordingly, "we review to determine whether the court instructed itself incorrectly as to the law." *Phillips Sisson Industries, Inc. v. Hysell*, 317 Or App 440, 446, 506 P3d 1139 (2022) (internal quotation marks omitted). That presents a question of statutory interpretation that we review for legal error. *See State v. Gaines*, 346 Or 160, 162, 206 P3d 1042 (2009) (so reviewing).

For background, we begin with the relevant facts, which are undisputed. The building in question is a house, and, as we will describe below, tenant lived in part of it. When she received the notice of termination from landlord, the rest of the house was unoccupied. Landlord notified tenant that her tenancy would be terminated pursuant to ORS 90.427(5)(c) because he intended to move into the house and occupy the house as his primary residence.

Landlord testified that the house had previously belonged to his parents and he had grown up there. His parents had "built a living room in the back," attached to what was previously a bedroom, and turned the bedroom into a laundry room and a bathroom. The back area was separated from the remainder of the house by an interior door that could be locked. The laundry room and garage were shared, and the house had one mailing address. Tenant testified that she lived in "the small studio in the rear."

In closing argument, tenant contended that, for two reasons, landlord had not complied with ORS 90.427(5)(c): First, landlord owned a second unit—that is, the front part of the house—in the same building as tenant's unit and it was available for occupancy when he gave her notice. Second, in tenant's view, the statute requires the landlord to intend to occupy *only* the tenant's dwelling unit as a primary residence. Tenant contended that, because landlord intended to occupy both tenant's unit and the rest of the house, he did not intend "to occupy [tenant's] dwelling unit as a primary residence." ORS 90.427(5)(c).

Regarding the second reason, tenant argued, among other things, that, under the statutory scheme of which ORS 90.427(5)(c) is a part, which we will discuss below, landlord could evict tenant to remodel the house to "turn it back into a single-family residence," but that, because it was presently separated into two dwelling units by the locked door, landlord could not evict tenant in order to occupy the whole house.

The trial court disagreed with tenant's contention that the house would need to be remodeled to be used as a single residence. It stated that the property "was a single-family dwelling." Tenant's counsel responded, "That was converted into two dwelling units." The court replied, "By locking a door. So he wants to unlock the door so he can live in the whole house again."

The court found that tenant's part of the house was integrated into the house as a whole; as the court stated, "[i]t's one house." Given that finding, along with testimony from landlord, which the court credited, that he intended to occupy the whole house as his primary residence, the court decided that landlord had made his case. The court did not expressly rule on tenant's first argument for dismissal, that landlord owned a "comparable unit" in the same building that was available for occupancy when he gave tenant notice, but implicitly rejected that argument.

On appeal, tenant reprises both of her arguments, contending that the court erred in construing ORS 90.427 (5)(c).

We begin with tenant's contention that the court incorrectly construed "comparable unit" in determining that landlord had shown that he did not own "a comparable unit in the same building." On appeal, tenant's argument about that requirement is extremely narrow: She argues that landlord owned a "comparable unit in the same building" solely because he owned two units in the same building. We reject that argument. Regardless of what, exactly, "comparable" means in this context, two units are not comparable solely because they are in the same building; rather, the statute requires them to be both comparable *and* in the same building. ORS 90.427(5)(c) (requiring that "the landlord does not own *a comparable unit in the same building* that is available for occupancy at the same time that the tenant receives notice to terminate the tenancy" (emphasis added)).

The parties also dispute what it means for a landlord to intend "to occupy the dwelling unit as a primary residence."[2] ORS 90.427(5)(c). As explained above, there was evidence that, although tenant's dwelling unit could be separated from the rest of the house by locking the door, when the door was unlocked, the two parts of the house constituted one living space; as the court noted, "[i]t's one house." Landlord argues that ORS 90.427(5)(c) applies here because he intended to occupy the whole house, which included tenant's dwelling unit, "as a primary residence." *Id.* In landlord's view, when a single living space, like a house, may be used as multiple dwelling units and the tenant occupies only part of it, the legislature did not intend to limit a landlord's occupancy of the space "as a primary residence" to only the tenant's dwelling unit.

For her part, tenant contends that the legislature intended "a primary residence" to mean only the dwelling unit occupied by the tenant. Thus, she argues, in this case, notwithstanding that her dwelling unit was an integrated

---

[2] The landlord must intend "for the landlord or a member of the landlord's immediate family to occupy the dwelling unit as a primary residence." ORS 90.427(5)(c). We recognize that the landlord may intend either for the landlord to occupy the dwelling unit or for a member of the landlord's immediate family to do so. However, for simplicity, in our discussion, we refer to the landlord's intention to occupy the unit as shorthand for the landlord's intention for the landlord or a member of their immediate family to do so.

part of the rest of the house when the door was unlocked, landlord had to intend to occupy only her dwelling unit "as a primary residence"; his intention to occupy the whole house, including her dwelling unit, did not suffice under the statute.

That presents a question of statutory construction that we consider by applying our well-established methodology in an effort to discern the intention of the legislature. *Gaines*, 346 Or at 171-72. We consider the text in context and may consider legislative history to the extent that we find it helpful. *Id.* If, after those steps, a statute remains ambiguous, we apply maxims of statutory construction to resolve the ambiguity. *Id.*

We begin with the text. The statute allows a landlord to terminate a tenancy, with proper notice, if "[t]he landlord intends for the landlord or a member of the landlord's immediate family to occupy the dwelling unit as a primary residence." ORS 90.427(5)(c). "Dwelling unit" means "a structure or the part of a structure that is used as a home, residence or sleeping place by one person who maintains a household or by two or more persons who maintain a common household." ORS 90.100(14).[3]

We note that the definition of "dwelling unit" is extraordinarily broad. Under that definition, whether a space is a separate dwelling unit depends on the use to which it is put. A house with multiple occupants is a single dwelling unit when it is "used as a home [or] residence * * * by * * * persons who maintain a common household." ORS 90.100(14). But the same house may contain multiple dwelling units if each of its bedrooms is "used as a * * * sleeping place by one person who maintains a household."[4] *Id.*; *see also*

---

[3] The relevant text of ORS 90.100, including the definitions of "dwelling unit," "roomer," and "tenant," is the same now as it was at the time of trial. However, other amendments to ORS 90.100 have resulted in changes of the numbering of those definitions. Because the text remains the same, we use the current numbering.

[4] The breadth and flexibility of the definition of "dwelling unit"—particularly the fact that the number of dwelling units in a structure depends on how the spaces are being used at a particular time—is in tension with provisions in which the legislature appears to contemplate that a given structure contains a readily ascertainable and fixed number of dwelling units. *E.g.*, ORS 90.427(6)(b) (providing an exception from a certain requirement for landlords who own "four or fewer residential dwelling units subject to this chapter"). However, that issue does not affect our analysis here.

ORS 90.100(43) (defining "roomer" as "a person occupying a dwelling unit that does not include a toilet and either a bathtub or a shower and a refrigerator, stove and kitchen, all provided by the landlord, and where one or more of these facilities are used in common by occupants in the structure); ORS 90.100(51) (defining "tenant" to include a roomer).

Under the statutory definition of "dwelling unit," in this case, the front and back areas of the house were separate dwelling units while tenant lived there, because she did not share a household with anyone living in the rest of the house. However, there was evidence that landlord's intention was to occupy the whole house as a single dwelling unit: As the court found, landlord intended to unlock the door and use the whole house as a single integrated home, which would be his primary residence.

Under these circumstances, the parties' competing constructions of what it means for a landlord to intend "to occupy the dwelling unit as a primary residence," ORS 90.427(5)(c), represent a disagreement about the perspective from which the legislature intended courts to consider the use of the tenant's dwelling unit. Tenant contends that the assessment is from the tenant's perspective, as it refers to the tenant's dwelling unit, and so should be limited by the way the tenant uses the space. Thus, in her view, the landlord is limited to occupying the space that, given the tenant's use, constitutes the tenant's dwelling unit—in this case, the back area of the house, consisting of the second "living room" and a bathroom.

By contrast, landlord contends, and the court held, that the assessment is from the perspective of the landlord, whose intent is at issue, and so should reflect the way the landlord intends to occupy the space. Landlord asserts that a landlord intends to occupy "the dwelling unit as a primary residence" when the space that is the tenant's dwelling unit is also an integrated part of a larger space that is configured for use as a single dwelling unit, and the landlord intends to occupy it that way.

The text is ambiguous. As tenant points out, it refers to the landlord's intent to occupy "*the dwelling unit*

as a primary residence." That refers to the tenant's dwelling unit, which suggests that the assessment should be from the tenant's perspective. Additionally, the other requirement of ORS 90.427(5)(c)—that "the landlord does not own a comparable unit in the same building that is available for occupancy at the same time that the tenant receives notice to terminate the tenancy"—explicitly identifies the time that the tenant receives notice (and, thus, a time when the tenant is occupying their dwelling unit) as the relevant point in time for that requirement.

However, as landlord points out, the main question for purposes of ORS 90.427(5)(c) is how the landlord intends to occupy the space—that is, whether the landlord intends to occupy it "as a primary residence." That focus on the landlord's plans suggests that the assessment should be from the landlord's perspective.

With that in mind, we consider the broader statutory context, as well as the legislative history of ORS 90.427(5)(c). The provision at issue was enacted as part of Senate Bill (SB) 608 (2019), in which the legislature substantially changed the existing RLTA to enact broad protections for tenants, including removing the ability of landlords, after the first year of tenancy, to evict tenants without stating a cause.[5] Or Laws 2019, ch 1. Proponents of the bill explained that it provided a "just cause" standard for evictions, which would protect tenants from arbitrary or discriminatory evictions, the destabilizing force of which have a dramatic negative effect on people's lives. Testimony, House Committee on Human Services and Housing, SB 608, Feb 18, 2019, Ex 5 (statement of Sybil Hebb, Director of Policy Advocacy, Oregon Law Center).

In place of the former authority that landlords had to evict tenants without providing a reason, the legislature codified a few "landlord-based causes" for eviction. Audio Recording, Senate Committee on Housing, SB 608, Feb 4, 2019, at 00:21:17 (statement of Sybil Hebb). The proponents of the bill explained that those reasons protected the ability

---

[5] SB 608 made those changes within the existing RLTA and retained the original definition of "dwelling unit." *See* Or Laws 2019, ch 1, § 6.

of landlords to "make business and personal decisions about the use of their property." *Id.* In addition to the provision that we are construing, ORS 90.427(5)(c), those reasons are as follows: the landlord intends to demolish the unit or convert it to a nonresidential use, ORS 90.427(5)(a); the landlord intends to make repairs or renovations that will render the dwelling unit unfit for occupancy or the unit is unfit for occupancy and needs repairs, ORS 90.427(5)(b); and the landlord has accepted an offer to purchase from a person who intends in good faith to use the dwelling unit as their primary residence, ORS 90.427(5)(d). Another provision in the bill allows a landlord who has their primary residence in a building or on property with no more than two dwelling units to evict a tenant from the second dwelling unit without stating any reason. ORS 90.427(8).[6]

---

[6] ORS 90.427(5) provides that, with certain notice and subject to other requirements, a landlord may terminate month-to-month and fixed-term tenancies after the first year if:

"(a) The landlord intends to demolish the dwelling unit or convert the dwelling unit to a use other than residential use within a reasonable time;

"(b) The landlord intends to undertake repairs or renovations to the dwelling unit within a reasonable time and:

"(A) The premises is unsafe or unfit for occupancy; or

"(B) The dwelling unit will be unsafe or unfit for occupancy during the repairs or renovations;

"(c) The landlord intends for the landlord or a member of the landlord's immediate family to occupy the dwelling unit as a primary residence and the landlord does not own a comparable unit in the same building that is available for occupancy at the same time that the tenant receives notice to terminate the tenancy; or

"(d) The landlord has:

"(A) Accepted an offer to purchase the dwelling unit separately from any other dwelling unit from a person who intends in good faith to occupy the dwelling unit as the person's primary residence; and

"(B) Provided the notice and written evidence of the offer to purchase the dwelling unit, to the tenant not more than 120 days after accepting the offer to purchase."

As relevant here, ORS 90.427(8) provides:

"If the tenancy is for occupancy in a dwelling unit that is located in the same building or on the same property as the landlord's primary residence, and the building or the property contains not more than two dwelling units, the landlord may terminate the tenancy at any time after the first year of occupancy:

"(a) For a month-to-month tenancy:

"* * * * *

Although the purpose of SB 608 was to protect tenants, the inclusion of landlord causes shows that the legislature prioritized property owners' ability to occupy their own residential property as their primary residence above tenants' interest in avoiding eviction. Under ORS 90.427(5)(b), landlords may evict tenants in order to renovate a property—a provision that, as tenant noted in her argument in the trial court, would appear to include evicting to reconfigure multiple dwelling units, even including those that are not already integrated into a single living space—into a space for the landlord to occupy as a single unit. In ORS 90.427(5)(d), the legislature ensured that a buyer of residential property will be able to occupy the property as a primary residence immediately when the purchase is complete. In ORS 90.427(5)(c), the provision we are construing, the legislature unambiguously provided that property owners who intend to use their property as a primary residence for themselves or their immediate family members have priority over tenants. (The question we are answering concerns only the scope of that priority.) Finally, in ORS 90.427(8), the legislature prioritized certain property owners' interests in choosing who occupies their property with them over tenants' interests in avoiding no-cause eviction.

In light of the legislature's concern for allowing property owners to use their residential property as their primary residence, we agree with landlord and the trial court that the legislature intended courts applying ORS 90.427(5)(c) to focus on how the landlord intends to occupy the space in order to determine whether the landlord intends to occupy "the dwelling unit as a primary residence." If the landlord intends to occupy as a primary residence a single integrated living space that includes the space that makes

---

"(B) Without cause by giving the tenant notice in writing not less than 60 days prior to the date designated in the notice for the termination of the tenancy[.]

"* * * * *

"(b) For a fixed term tenancy:

"* * * * *

"(B) At any time during the fixed term, without cause by giving the tenant notice in writing not less than 30 days prior to the specified ending date for the fixed term, or 30 days prior to the date designated in the notice for the termination of the tenancy, whichever is later."

up the tenant's dwelling unit,[7] the landlord intends to occupy the tenant's dwelling unit "as a primary residence."

As explained above, in this case, the court found that tenant's dwelling unit was integrated with the rest of the house, such that, with the door unlocked, the whole house could be occupied as a single primary residence. It also found that landlord intended to occupy the whole house as his primary residence. Given those findings, the trial court did not err in determining that ORS 90.427(5)(c) was satisfied.

Affirmed.

---

[7] In a situation in which the landlord intends to occupy the tenant's dwelling unit and another dwelling unit or units that are *not* integrated with the tenant's dwelling unit—for example, multiple apartments that are separated from each other by a publicly accessible hallway or some other structural separation, we agree with tenant's argument below that the landlord could not rely on ORS 90.427(5)(c). A person's intention to occupy a living space "as a primary residence" does not encompass an intention to occupy multiple structurally separated spaces as a single home.